LOWELL et al. v. TRIPLETT et al.

No. 2193.

District Court, D. Maryland.

Jan. 13, 1937.

Clifton V. Edwards and Reverdy Johnson, both of New York City, John B. Brady, of Washington, D. C., and Semmes, Bowen & Semmes and Gaylord Lee Clark, all of Baltimore, Md., for plaintiffs.

Darby & Darby, Samuel E. Darby, Jr., Fish, Richardson & Neave, and Stephen H. Philbin, all of New York City, and Cook & Markell and Charles Markell, of Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, District Judge.

The present suit is for alleged infringement of three patents which, broadly classified, may be described as relating to radio receiving apparatus. Plaintiffs, consisting of the two patentees, Messrs. Lowell and Dunmore, and their licensee, the Dubilier Condenser Corporation, contend that all of these patents are infringed by the apparatus sold by defendants, consisting of a partnership, the Baltimore Gas Light Company, and the four individuals composing it. Defendants deny infringement, and also assert invalidity of plaintiffs' patents.

The three patents are as follows: First, patent to Lowell and Dunmore No. 1,455,141, on application filed March 27, 1922, issued May 15, 1923, relating to a three-part radio receiving set, and which, for convenience, will be referred to as the "receiver" patent. Of the twenty-one claims in this patent, only eight are in suit, namely, claims 1 to 4, 7, 13, 14, and 18, of which claims 1, 3, and 18 are typical. Second, patent to Dunmore No. 1,635,117, on application filed February 27, 1922, issued July 5, 1927, relating to the placing of a bias (electrical charge) on the grid of a radio tube. This patent, for convenience, will be referred to as the "grid" patent. Of the twelve claims in this patent, only 9, 11, and 12 are in suit, of which the first two are typical. Third, patent to Dunmore & Lowell No. 1,606,212, on application filed March 21, 1922, issued November 9, 1926, relating to the loud speaker part of a receiving set. This patent will be referred to for convenience as the "speaker" patent. All of the nine claims of this patent are in issue.

All three patents have been in litigation in Delaware (the Third Circuit). There, the District Court held that the "receiver" patent and the "grid" patent were valid and infringed by the then defendant, the Radio Corporation of America, but that the "speaker" patent was not infringed, the court making no finding as to the validity of the latter patent. Dubilier Condenser Corp. v. Radio Corporation (D.C.) 34 F. (2d) 450. Upon an appeal to the Circuit

Court of Appeals for the Third Circuit (this appeal, however, not involving the "speaker" patent), that court reversed the lower court, deciding that the "receiver" and "grid" patents were invalid for want of patentable invention. Radio Corporation v. Dubilier Condenser Corp., 59 F.(2d) 305, 309. A petition by plaintiffs for a rehearing was denied (59 F.(2d) 305, 309), as likewise were their petitions to the Supreme Court for writs of certiorari. 287 U.S. 648, 650, 53 S.Ct. 96, 77 L.Ed. 560.

The present suit was first before this court two and a half years ago, when defendants moved to dismiss it as to the "receiver" and "grid" patents, on the ground that the Third Circuit decision was final and binding upon the plaintiffs due to their alleged failure to comply with the disclaimer statutes, R.S. §§ 4917 and 4922 (35 U.S.C. §§ 65 and 71 [35 U.S.C.A. §§ 65, 71]), by promptly filing disclaimers following the Delaware decision. This court granted defendants' motion; proceeded with trial of the suit with respect only to the "speaker" patent, and found that patent valid and infringed. On appeal to the Circuit Court of Appeals for the Fourth Circuit, that court reversed this court and awarded to the plaintiffs a trial on the merits with respect to the "receiver" and "grid" patents, declining to decide any issue with regard to the third, the "speaker" patent, on the ground that, since its subject matter was so closely allied with that of the other two patents in suit, it was unwise to pass upon its merits until the whole controversy was before the appellate court. In remanding the whole case to this court, the appellate court granted leave to the parties to take additional testimony with respect to the third or "speaker" patent, should they see fit to do so; and leave, also, to this court to reaffirm or modify or reverse its former decree as to this patent, after the evidence on all of the patents had been taken and the entire case presented for final determination. Lowell v. Triplett (C.C.A.) 77 F.(2d) 556.

To review this reversal of this court's decree dismissing the suit on defendants' motion as aforesaid, with respect to the "receiver" and "grid" patents, a petition for a writ of certiorari was filed with the Supreme Court. The petition was granted, to resolve the questions raised as to the scope and effect of the disclaimer statutes. Triplett v. Lowell, 296 U.S. 570, 56 S.Ct. 306, 80 L.Ed. 402. The Supreme Court affirmed the appellate court, Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L. Ed. 949, with the result that the remanding of the case to this court for further proceedings was affirmed, which means that the question both as to the validity and infringement of all three of the patents is now before this court de novo.

There is also presented the further question—not raised by the petition for certiorari, and not heretofore passed upon either by the Circuit Court of Appeals for the Fourth Circuit or by this court—whether the purported disclaimers operate to enlarge the claims in such manner as to render both the old and the new claims invalid by virtue of the reissue statute (R.S. § 4916, 35 U.S.C. § 64 [35 U.S.C.A. § 64]). The Supreme Court, and the Circuit Court of Appeals, assumed, without deciding, that the disclaimers were inadequate because they failed to concede invalidity of the adjudicated claims. On this assumption, its decision was limited to the precise point that want of disclaimer of claims previously held invalid cannot be set up as a bar in limine to the maintenance of a second suit upon those claims and any others of the patent, since a patentee is entitled to invoke, in such second suit, the independent judgment of the court upon the validity of the claims which have been held invalid; and that, in advance of its decision as to validity, such second court cannot consistently hold that there is necessity for disclaiming claims which, although previously adjudged invalid, it may hold to be valid; that is to say, the court whose jurisdiction is thus invoked by such a second suit must determine for itself validity and ownership of the claims asserted, notwithstanding a prior adjudication of invalidity of some of them, unless those issues have become res adjudicata by reason of the fact that both suits are between the same parties; and if, in such second suit, it be determined that the claims previously adjudicated in the first suit are valid, there would be no occasion for disclaiming.

For an adequate understanding of the precise questions involved in this litigation, it is necessary to review, at least briefly, the background of plaintiffs' alleged inventions. That is to say, it is necessary to visualize the state of the radio art at the time, since these alleged inventions are directed particularly to the elimination of hum occurring in vacuum tubes—the basic factors in the art—when operated, as they most generally are to-

day, by alternating or common house-lighting electric current.

For many years prior to the date of the earliest application for any of the patents in the present suit, namely, February, 1922, wireless transmission, that is, wireless telephony of sound, sound being the effect or result of vibrations, varying in frequency, upon the air or ether, had been known and accomplished by means of electrical current. Below 16 vibrations or cycles a second the vibrating frequency is too low to be heard·by the human ear, whereas above 16,000 vibrations it is too high. For example, we have in nature supersonic noises, namely, sounds above the range of human audibility, such as the note of the hummingbird, which rises higher and higher until no longer heard, although the bird's mouth appears open and still in the act of singing; and, similarly, the sound of the field cricket produced by rubbing together small wing covers, not adapted for flight.

Since vibrations or waves of electrical current of low frequency lack velocity or momentum, the distance over which they may be transmitted is necessarily limited. But the higher frequency waves, namely, those from 10,000 to 1,000,000 vibrations a second, and higher, have a velocity or momentum of light, and consequently have a great traveling range. Thus, for the purpose of transmitting sound over great distances, such high frequency electrical waves are used to carry it. To do so, such waves must first be created. This is accomplished by placing, by means of an electric-generator, alternating current, of the desired high frequency, upon some elevated conductor or aerial, commonly known as an antenna. Direct electrical current placed upon the antenna will not produce such waves, because uniform and "smooth," so alternating current, which reverses itself in its direction at regular intervals of time, is employed. That is to say, from nothing, it builds up in strength, reaches a maximum, and then returns to zero or its starting point, which represents a one-half cycle. It then builds up to a maximum in the opposite direction and returns to zero again, thus completing a cycle, and so on. The number of complete cycles that thus occur in a given second represents the frequency of the alternating current.

When these waves pass from the antenna, they are all of the same intensity, and thus will produce no sound upon the apparatus receiving them, for their frequency is such as to produce no effect upon a loud speaker or telephone receiver, that is, to permit no vibration, or, if there is any vibration, it is inaudible because its frequency is so high as to be above the audible range of the human ear. On the other hand, when sound vibrations, as, for example, the human voice, are impressed upon these high frequency waves, these vibrations add their values to, or subtract them from, the average strength of the high frequency waves, thus producing variations in the latter. A receiving antenna intercepts the waves, thus modulated or varied, identical with those in the transmitting antenna. At this stage, it becomes necessary, first, "to unmix" these high frequency waves, or current, that is, to rectify it so that the sounds that have been impressed upon it may be detected, and then amplified so as to become clearly and satisfactorily audible to the human ear.

It was not until the invention of the radio vacuum tube about 1908 that adequate means were found for receiving and making the high frequency waves, with their "hidden" message audible. The British scientist Fleming, and the American scientist De Forest, with their so-called "valve" and "audion" respectively, were the great pioneers. The tube resembles an incandescent lamp, in that it is a glass bulb highly exhausted of air or gas, but differs from the lamp in that it contains three electrodes, instead of one, the character and functions of these different parts being hereinafter precisely described.

The development of wireless telephony or radio was slow until about 1912 or 1913, when the art became rather actively employed by telegraph and telephone companies, and more particularly by governmental agencies. Amateurs in large numbers also entered the field. In 1920 the Westinghouse Company made the first general broadcast by radio which could be picked up generally, and the same year that company established a broadcasting station, KDKA, at Pittsburgh. Other broadcasting stations rapidly followed, with the result that there arose a public demand for receiving sets of a general commercial type, and these were placed on the market. Of such sets the most popular was the so-called three-section type, that is, the type having (1) the radio frequency amplifier tubes; (2) the detector or rectifier tubes; and (3) the audio frequency amplifier

tubes, the characters and functions of which will be later described. The circuits for these various tubes were supplied with electrical energy by direct current from storage and dry cell batteries which became known, according to their respective uses, as A, B, and C batteries. Obviously, when in constant use in the home or elsewhere, these batteries soon became exhausted and had to be replaced, which involved inconvenience and expense, and they were not, therefore, commercially very satisfactory. The problem then arose of how to use, in substitution for direct current from batteries, the common household, alternating current. Two primary obstacles had to be overcome: First, such alternating current is of about 110 volts, which is not a suitable voltage because too high for some parts of the set, and too low for others; second, its frequency is 60 cycles a second, and the rapid and continued reversals of its direction necessarily produce, in a receiving set, a distortion of the wave modulations and a strong hum or interfering sound. It was to the problem of eliminating these undesirable conditions that the individual plaintiffs in the present suit, Messrs. Lowell and Dunmore, primarily directed their attention.

The three patents will be considered separately, and we will first take up the patent to Lowell and Dunmore, No. 1,-455,141.

### Lowell and Dunmore Patent No. 1,455,141.

This patent is the so-called "receiver" patent. Eight claims are in suit, claim 1 being typical also of claim 2, claim 3 being typical of claims 4 and 7, and claim 18 being typical of claims 13 and 14. We will therefore confine our consideration to claims 1, 3, and 18, which are as follows:

"1. In an apparatus for receiving radio signals the combination of a source of signal energy, means for amplifying said energy, means for rectifying said energy, and a source of alternating current for supplying power to said amplifying means and a plurality of means in circuit with said amplifying means for eliminating the hum of said alternating current in said apparatus."

"3. In an apparatus for the reception of radio signals the combination of [1] a source of signal energy, [2] means for amplifying said signal energy at radio frequencies, [3] means for rectifying said energy, [4] means for amplifying said energy at audio frequencies, [5] a source of alternating current for supplying power to said amplifying means and [6] separate means connected to each of said amplifying and rectifying means for eliminating the hum of said alternating current in said apparatus."

"18. In an apparatus for the reception of radio signals the combination of a source of signal energy, a plurality of vacuum tubes having grid, filament and plate electrodes, a detector, circuits interconnecting said electrodes and said detector, a source of alternating current for supplying power to said circuits, and means connected in circuit with said grid and plate electrodes for eliminating the hum of the alternating current in said apparatus."

On July 8, 1933, disclaimers were filed, which, with respect to the three claims just quoted, are as follows:

"(1) To any 'source of alternating current for supplying power to said amplifying means' as set forth in claim 1 except such as supplies raw alternating current to the cathode heating circuit or circuits of such amplifying means and rectified current to the plate circuit or circuits of such amplifying means; to any 'plurality of means in circuit with said amplifying means for eliminating the hum of said alternating current in said apparatus' except such means as comprises: (a) a connection from the grid of the amplifying means to the cathode thereof at a point not subjected to the influence of variations of the cathode heating current; (b) elements connected between the stages of said amplifying means which prevent the passage of power supply frequencies; and (c) a resistor shunted by a condenser interposed in the circuit between the grid and cathode of the amplifying means where said condenser forms a low impedance path for both signal and power supply frequencies and wherein the voltage drop across said resistor provides a negative bias for the grid of the amplifying means."

"(3) To any 'source of alternating current for supplying power to said amplifying means' as set forth in claim 3 except such as supplies raw alternating current to the cathode heating circuit or circuits and rectified current to the plate circuit or circuits of such amplifying means; to any 'separate means connected to each of said amplifying and rectifying means for eliminating the hum of said alternating current' except as comprises: (a) connecting the

grid of the amplifying means to the cathode thereof at a point not subjected to the influence of variations of the cathode heating current, and (b) elements connected between the 'means for amplifying said signal energy at radio frequencies' and the 'means for rectifying said energy' which prevent the passage of power supply frequencies."

"(18) To any 'source of alternating current for supplying power to said circuits' as set forth in claim 18 except such as supplies raw alternating current to the cathode heating circuit and rectified current to the plate circuit or circuits of the vacuum tubes; to any 'means connected in circuit with said grid and plate electrodes for eliminating the hum' except such as comprises: (a) connecting the grids of the vacuum tubes to the cathode thereof at a point not subjected to the influence of variations of the cathode heating current, and (b) interposing filter elements in the plate circuit to reduce fluctuation in power supply frequencies; and to any 'circuits interconnecting said electrodes' except as include a radio frequency transformer."

Defendants contend that these disclaimers render the claims invalid because they add a new element to each of the combinations described in the claims, namely, that the disclaimers operate to enlarge the claims in such fashion as to render both the old and the new claims invalid by virtue of the reissue statute. The disclaimers were, of course, nonexistent at the time of the litigation, respecting this patent, in the Third Circuit, and, as previously noted, have never been passed upon by the Supreme Court, the Court of Appeals for this circuit, or by this court. In this connection the Supreme Court said (297 U.S. 638, 646, 56 S.Ct. 645, 649, 80 L. Ed. 949): "We do not decide whether the purported disclaimers operate to enlarge the claims in such fashion as to render both the old and the new claims invalid by virtue of the reissue statute. See Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., supra, 490–492. That 492, 55 S.Ct. 455, 79 L.Ed. 1005. That question is not presented by the petition for certiorari. The courts below do not appear to have passed upon it, and it may be unnecessary to decide it on the new trial." The rule on this point is clearly stated as follows in the Altoona Case, referred to in that portion of the Supreme Court's opinion just quoted (294 U.S. 477, at page 490, 55 S.Ct. 455, 460, 79 L.Ed. 1005): "The disclaimer is authorized by Rev.St. § 4917 (35 U.S.C.A. § 65), which provides that, when 'through inadvertence, accident, or mistake * * * a patentee has claimed more than that of which he was the * * * inventor * * * his patent shall be valid for all that part which is truly and justly his own,' provided that he or his assigns 'make disclaimer of such parts of the thing patented as he shall not choose to claim * * * stating therein the extent of his interest in such patent.' While this statute affords a wide scope for relinquishment by the patentee of part of the patent mistakenly claimed, where the effect is to restrict or curtail the monopoly of the patent, it does not permit the addition of a new element to the combination previously claimed, whereby the patent originally for one combination is transformed into a new and different one for the new combination."

As the Supreme Court points out, in a footnote to its ruling just quoted, the disclaimer and reissue statutes were adopted to avoid the rule that, if one claim is invalid, the whole patent is void; and that the use of the disclaimer is appropriate and valid in the following instances: (1) Where the elimination from the patent of matter not relied upon does not operate to enlarge the monopoly of the patent, but narrows it, as, for example, by eliminating entirely some of the claims of the patent; (2) by striking out an alternative method or device; (3) by limiting a claim or specification by deleting unnecessary parts; or (4) by limiting the claim to a specific type of the general class to which it was applied.

While we might defer consideration of the question whether the disclaimers did, in fact, violate the rule, as above laid down by the Supreme Court, until after the integral parts of the claims have been reviewed and a complete understanding is had of what they comprise, nevertheless, since we reach the conclusion that only with respect to subsection (c) of claim 1 as changed by the disclaimer has the rule been violated, it would seem appropriate so to state here, at the outset, deferring, however, to a more appropriate part of this opinion, a disclosure of our reasons for this conclusion. We find that the instance above referred to in claim 1 is the only instance in which the disclaimer has added a new element not embraced in the original claim. We find that the disclaimers

have done nothing with respect to all other parts of all three claims except what is permissible, as we have just seen, namely, limit the specific claim to a specific type of the general class to which it was applied. If such were all that had been done in the Altoona Case, the disclaimer, we must assume, would have been valid, but, as the court there said (294 U.S. 477, 489, 490, 55 S.Ct. 455, 460, 79 L.Ed. 1005): "While the effect of the disclaimer, if valid, was in one sense to narrow the claims, so as to cover the combinations originally appearing in claims 9 and 13 only when used in conjunction with a flywheel, it also operated to add the flywheel as a new element to each of the combinations described in the claims."

Claim 3 is the most typical claim, because it embraces all three of the major elements involved in a three-part receiving set, namely, the radio frequency amplifier unit, the detector unit, and the audio frequency amplifier unit. This being true, and the patent being for a combination of these various units used in conjunction with various other integral parts, a more complete understanding of the precise problem involved can be had by splitting up claim 3 and isolating the separate means or elements which are embodied in it. As an aid to this, these elements, six in number, have been marked by small numerals in the foregoing quotation of claim 3.

First, we find "[1] a source of signal energy"; which is the electrical current given out at the broadcasting station. Next are the "[2] means for amplifying said signal energy at radio frequencies." We have already seen that the sound waves that are picked up by the antenna of the radio receiving set are in the first instance feeble, and of such high frequencies as to be inaudible to the human ear. Therefore, two things must be accomplished: First, their strength must be raised, and, second, their frequencies lowered. The first is what is meant by "[2] means for amplifying said signal energy at radio frequencies." In the patent, the specific means to accomplish the first result comprises one or more vacuum tubes, and the specific means to accomplish the second result, that is, to make the waves that have been amplified or raised in strength audible to the human ear is the third element, namely, "[3] means for rectifying said energy," that is, either a crystal or tube, known as a "detector," which rectifies or converts these inaudible waves into waves of such lower frequencies that they come within a range audible to the human ear. Nevertheless, they are still not as loud or as distinct as is desired, and, therefore, a means is provided for making them so, which is the "[4] means for amplifying said energy at audio frequencies," which represents the third unit of the receiving set, and consists of one or more vacuum tubes and performs the final function of amplifying the audible sounds to the desired volume, whence they pass to the loud speaker.

These various means require electric current termed in the claim "[5] a source of alternating current for supplying power to said amplifying means," such alternating current being the ordinary house-lighting current. Lastly, the claim provides "[6] separate means connected to each of said amplifying and rectifying means for eliminating the hum of said alternating current in said apparatus." These means separately connected with each of the three sections of the receiving set, that is, first, the radio frequency amplifier section, second, the detector section, and, third, the audio frequency amplifier section, constitute the hum-eliminating means in the claim, and form the basis of the alleged patentable invention. These means referred to in technical language under subheadings (a) and (b) of the claim as modified by the disclaimer may be otherwise described as (1) operation of the filament in the tube by "raw" alternating current with a mid-point connection or potentiometer; and (2) use of a radio frequency transformer. These terms, however, need clarification, and can best be understood by an elementary analysis and explanation of the construction and functioning of the so-called three electrode vacuum tube.

Like electrical charges repel each other; opposite charges attract each other. When any electric current is passed through a filament, i. e., a wire usually of tungsten combined with other elements, it heats the filament, and electrons, which are negative electric charges, are emitted and attracted by positive charges. We have seen that radio high frequency waves carry with them sound waves, which are low frequency waves, when the latter, after being converted into electrical waves (as when the human voice impinges upon a telephone mouthpiece or a microphone), are superimposed upon the former. This is known as modulation, and the result is

what is referred to as modulated waves. These modulated waves lose strength as they travel, and therefore, if the distance from the place from which they have been sent to the place at which they are to be received is great, their strength, commonly spoken of as the signal, at the latter place is weak. Such weak modulated waves must, therefore, be both reduced to a frequency audible to the human ear, and then that audibility must be intensified or amplified so as to make the sound loud enough to be easily and satisfactorily heard.

The three electrode vacuum tube may be described as a glass bulb within which a vacuum has been created; which contains three electrodes or conductors of electrical current and which has two electrical circuits; one, the input circuit, i. e., the circuit which receives the modulated waves, the creation and transmission of which has just been described; and, two, the output circuit, which expels the modulated waves in amplified form. The three electrodes are (1) the filament, or cathode (the name given to the negative of an electrical source), which has been previously described; (2) the grid which is, as its name implies, a series of wires with interstices which in turn are given a negative electrical charge; and (3) the plate, or anode (the name given to the positive terminal of an electrical source), which is a solid plate of metal separated from, and completely surrounding the grid. The electrons given off by the heated filament are negative, and therefore the tendency will be for these electrons to flow across to the positive charge on the plate. Thus, if there be placed, in the line of flow of these electrons, a negative charge, that is, if a negative charge upon the grid is interposed between filament and plate, such flow will be decreased in accordance with the intensity of such negative charge so interposed. Therefore, the modulated wave, if introduced into the grid, or input circuit, will modify the negative charge upon the grid and will impress its characteristics upon the flow of electrons from filament to plate, thus producing in the plate, or output circuit, an electrical wave of the same characteristics as was originally introduced into the input circuit. This output wave, however, is much greater in intensity than the input wave, as a result of an inherent property—the ability to amplify—of the vacuum tube. Furthermore, this output wave, if it is to be an exact reproduction of

what left the transmitting station, i. e., the input wave, must remain undisturbed by other factors, or such exact reproduction is obviously destroyed. A reversal of current, such as is inherent in alternating current, produces a hum. Thus, if the filament in the tube is, as we have seen, heated by alternating current for the purpose of producing the electrons, hum is produced. Similarly, with respect to the use of alternating current to energize the plate with a positive charge. That is to say, any variation from the normal potential in any part of the tube will affect the ultimate sound output, and if such variation is continuous and substantial, that output will become unsatisfactory or even completely intolerable.

In battery-operated receiving sets, the filament is heated by the direct current of what is commonly called the A battery; the plate is given its positive charge by what is commonly known as the B battery; and the grid is given its negative charge by a C battery. Thus, it will be seen that the potential, or voltage relation, of each part of the tube to the other parts is practically constant, except as affected by the incoming modulations impressed upon the grid, and such changes as the operator himself may make in the charge given to the filament or to the plate. This being true, it matters not to which end of the filament the grid and plate circuits are connected. That is to say, it matters not that all parts of the filament are not at the same potential with respect to the plate or grid, for such difference of potential is constant, and, therefore, produces no variations in the plate current. On the other hand, if alternating current is substituted for battery current, the normal potential of the grid and the plate would be made more positive or more negative, with respect to the other end of the filament than that to which the grid and plate are connected, by each alternation of the current, thus causing hum. So, instead of connecting the plate and the grid circuits to one end of the filament circuit, as is done when direct current from batteries is used, it was found that if the plate circuit is connected to one end of the filament circuit and the grid is connected to the filament circuit, not at points of maximum potential variation, but at points having the average potential of the whole filament, and is made adjustable, the hum introduced by one connection would counteract or balance out the hum introduced.

by the other. This is known as the mid-point connection, hereinafter frequently referred to in this opinion, and is one of the hum-eliminating elements asserted by the plaintiffs to be one of the component parts of their alleged novel and, therefore, patentable combination, although it is not contended that the mid-point connection itself is new in the plaintiffs' combination.

If the hum, or interference, is not eliminated, the disturbing effect in the three integral parts of the receiving set would be, briefly stated, as follows: In the first, or radio frequency section, it would be to distort the modulation upon, or to further modulate the weak incoming waves, i. e., to superimpose upon them this hum due to the alternating current. In the second, or detector section, the modulated wave is rectified, that is, de-modulated, which has the reverse effect of modulation, namely, the modulated wave is separated into its two components, to wit, the radio or high frequency part and the low frequency part, and by the passage of the latter only the effect of this hum is an exaggeration of the same tendency to distort, found in the radio frequency section. Lastly, since from the detector only the low frequency wave goes through the audio frequency transformer or transformers, which are designed to pass waves or plate current pulsations of audio frequency only, i. e., of such frequency as the human ear can detect, and to deny passage to those waves of radio frequency, the effect of the use of alternating current, while not to further modify the transmitted low frequency waves, is, nevertheless, to amplify the hum, because, the amplifier itself being designed to directly amplify low frequency waves, the hum, as well as the low frequency wave, will be amplified, because the former is also of low frequency. So in the plate circuit there will be both the hum and the low frequency signal, and the former will dominate, or drown out, the latter.

It is now appropriate to attempt to state, as succinctly as possible and with the minimum use of technical phraseology, just what the plaintiffs assert is the novelty in this patent as typified by claim 3, which, as we have seen, is the most typical of the three typical claims, namely, 1, 3, and 18, because it embodies all three units of the receiving set in combination; and because as we have also seen, the patent is for a combination.

The following definition is believed to be a reasonably accurate composite of the various statements of the fundamental object of the patent, as set forth in the preamble or introduction to the specifications in the patent itself, and as given in the course of the trial by counsel and witnesses on behalf of plaintiffs: to provide means that will insure the satisfactory, combined operation of the separate parts of a radio receiving instrument, namely, the two amplifier sections (the radio frequency amplifier and the audio amplifier), and the third, or detector, section, by alternating current, without interference by the hum inherent in the use of such current.

Plaintiffs do not contend that they use throughout the entire combination a single device which, in and of itself, is new. Furthermore, plaintiffs do not contend that their use, by itself, of any of the admittedly old devices, is for the purpose, in and of itself alone, of eliminating the hum interference produced by the alternating current. That is to say, it is not contended that the mid-point connection alone constitutes a hum-eliminating means; or that the resistors and condensers as specified for either of the amplifier portions of the receiving set in plaintiffs' patent alone constitute hum-eliminating means; and they admit that the same is true with respect to the integral parts of the detector portion of the set, and with respect to the transformer between radio frequency amplifier and the detector. The claim is that all of these things function conjointly, one with the other, and that, in producing this conjoint action, the plaintiffs were the first to conceive and make operative in one combination a resistor, condenser, and mid-point connection in the radio frequency amplifier and audio amplifier portions; a radio frequency transformer between the radio frequency amplifier and the detector portions, and a humless detector and drain (condenser) in the detector portion, all of which, in combination and sequence, constitute means for eliminating the hum inherent in alternating current operation of the receiving set.

The District Court of Delaware (Judge Morris) found this patent to be valid, as has heretofore been stated. [34 F.(2d) 450.] The reason for so doing may be best explained by quoting the following excerpts from Judge Morris' opinion [34 F.(2d) 450, 456, 457], these having direct relation to

claim 14, but claim 3, which is most typical of the claims in the present suit, was also in issue before Judge Morris, and the two claims are not different in any material sense: "In fact, plaintiffs concede that every element of their claims was, in itself, in fact old. But they correctly assert that no one before them ever applied raw alternating current to the filaments in the audio frequency portion of a receiving set, and that there was no prior disclosure or suggestion that separate hum-eliminating means installed in the several parts of the receiver would be advantageous. * * *

"It is quite true that the patentees did not eliminate all causes of hum arising from the use of alternating current. They did not eliminate the hum producing fluctuations in the plate current arising from the variations in the temperature of the cathode and from the fluctuations of the magnetic and the electrostatic fields surrounding the filaments. They did not invent or disclose a tube detector possessing the advantages of both a crystal and an audion [i. e. a three electrode tube] when used with alternating current. And it is quite possible that these further steps needed to be taken before the alternating current operated set could be made commercially successful. The patentees are entitled to no credit for these later improvements. But they were the first to make and disclose a receiver, of the type claimed, operable by alternating current."

On appeal, however, the Circuit Court of Appeals for the Third Circuit reversed this finding of the lower court. Its reason for so doing may best be understood by quoting the following excerpts from the opinion of Judge Woolley [59 F.(2d) 307]: "Therefore, in the final analysis, the claimed invention consists in applying curbed alternating current to the detector section and the audio frequency amplifier section and also to the radio frequency amplifier section in the same way that it had previously been applied to the last named section. Is this invention?

"It might be invention if, when operating, some hum should develop in the first section and pass over to the second section, or if hum in these two sections should invade the third section and be suppressed before it reaches the loud speaker by the three hum eliminators coacting to that end. In other words, there might be invention if the hum eliminators, though separately placed, functioned together on the circuits of all sections in eliminating wandering hum. There is, however, no suggestion of such hum action, and no such interrelation or coaction of separately placed hum eliminating means is claimed for the invention. Instead of doing anything like this, the plaintiffs themselves claim that the hum is killed 'at the source'—at the mid-point connection—that each eliminator stops hum in the tubes of its own section, or, rather, as we look at it, each eliminator prevents hum from developing in the tubes with which it alone is connected, leaving nothing for the other eliminators connected with the other sections to do with the tubes of its section or with hum in them. So it appears that each eliminator performs in the apparatus of the combination claim the same function it performed in the device from which it was taken, * * * that is, each does its own work in its own section and is through. The result, in theory at least, is complete hum prevention or elimination in each section by each eliminator. It follows that the effect of the operation of all the eliminators is an aggregation of separate results, * * * all alike and all admittedly obtained by prior art means. From the very nature of the circuit connections, the three eliminators act independently of one another. * * *. Operating separately yet in conjunction with other elements of the combination, they evolve no new co-operative function, * * * and the new result, as claimed, is only that which arises from the well-known operation of each one of the several elements of the combination. * * *."

In the case as now presented, plaintiffs contend that, while the reasoning of the Circuit Court of Appeals for the Third Circuit is logical and consistent, it is nevertheless based upon a misconception of the actual facts with respect to the patent, and has therefore led the court to an erroneous conclusion; that is to say, plaintiffs contend, as has already been pointed out, that there is a conjoint action of all of the various hum eliminating means throughout the entire set and that each of these means does not, as the Circuit Court of Appeals stated, merely do "its own work in its own section and is through." In support of this contention, plaintiffs rely upon the tests made in open court in the present suit, which demonstrated that hum developing in the first or radio amplifier section of the set does pass over to the second section, and so on; and that removal of the resistor—con-

denser—and mid-point connection from either the radio amplifier unit or the audio amplifier unit of the set resulted in very marked, objectionable hum.

Having thus analyzed the basis upon which the plaintiffs claim to have produced something new, and highly useful, and having considered how such claim reacted upon the courts in the Third Circuit, it is appropriate now to pass to a consideration of the prior art and to determine, in the light of it, whether the patent does in fact amount to invention. For this purpose we will divide our consideration of the subject into two branches: First, a consideration of the prior art patents which defendants assert anticipate the plaintiffs' patent; and, second, prior art publications which defendants assert do the same thing.

### The Question of Validity.

*Prior Art Patents.*

The patents upon which defendants primarily rely are the following, five in number: Patent to White, No. 1,195,632, on application of August 23, 1915, issued August 22, 1916; to Heising, No. 1,432,022, on application of October 11, 1916, issued October 17, 1922; to Langmuir, No. 1,282,- 439, on application of October 29, 1913, issued October 22, 1918; to Schloemilch and Von Bronk, No. 1,087,892, on application of March 14, 1913, issued February 17, 1914; and to Colpitts and Arnold, No. 1,388,450, on application of September 3, 1915, issued August 23, 1921.

It will be helpful to consider together the first two of the above-named five patents, namely, the patents to White and Heising. In so doing it must be borne in mind that, in addition to the use of the mid-point connection between the filament and the grid in plaintiffs' patent, as a hum-eliminating means, it is claimed that the use in the grid circuit of a resistance shunted by, that is to say, connected in parallel with a condenser which maintains steady grid voltage, is also a means for eliminating hum. In other words, it is claimed that, with the aid of a resistance and a condenser, the pulsating energy delivered to the condenser stores up energy therein and discharges the same across the resistance which serves to keep a constant potential on the grid and to form a low impedance path for the signal. Or, stated in a still different manner, the resistance and the condenser function in combination to reduce hum frequencies at least to the extent that the grid voltage cannot change to such an extent that the signal modulation would be destroyed. In brief, it is claimed that by utilizing (1) the resistor, (2) the condenser, and (3) the mid-point connection for the purpose of maintaining the proper negative bias on the grid, the tube, in addition to being an amplifier, operates so as to prevent the introduction of hum sufficient to distort the signal.

The distinctive feature of the White patent is that it provides for the mid-point connection on a transformer at the source of the alternating current for the filament. This patent antedates, both as to application and issuance, the patent to Heising and yet the latter patent discloses something new over White in the following respects: In Heising the mid-point connection, instead of being placed on the transformer at the source of the current, is placed on the resistance connected across the filament and is accomplished by a slider or potentiometer. While White also disclosed the mid-point connection to the grid as well as to the plate, such connection was confined to the transformer, whereas Heising not merely disclosed the mid-point connection with respect to both the grid and plate, but accomplished his purpose by connecting to the mid-point on the resistance between the filament. That is to say, both with respect to the plate and grid circuit Heising was new over White with respect to the manner in which the mid-point connection was accomplished, to wit, Heising accomplished it on the resistance between the filament in both cases, whereas White accomplished it on the transformer in both cases. In addition, Heising disclosed what also was not disclosed by White, namely, the return of the plate circuit to one side of the resistance with the grid circuit returned to the slider or potentiometer. The patent in suit calls for the latter circuits only.

The Circuit Court of Appeals for the Third Circuit states that the plaintiffs simply used the mid-point connection as Heising had taught in the light of what White had taught. See 59 F.(2d) 305, at page 307. Judge Morris likewise in his opinion points out that Heising had disclosed the same mid-point connection used by the patentees. See 34 F.(2d) 450, 456. In these statements we concur. It is obvious that, in so far as the mid-point connection is concerned, plaintiffs evolved nothing

new, nor is there any claim on their part that they did.

We pass now to the third of the above-named alleged anticipating patents, namely, the patent to Langmuir No. 1,282,439. This patent discloses a receiving system for radio signals consisting of several stages of radio frequency amplification, a tube detector, and an audio frequency amplifier. The entire system is operated by direct current which alone is sufficient to distinguish the patent from the one in suit. The patent also discloses the combination of a resistance and a condenser for the purpose of obtaining grid bias for a detector tube. The actual values of the resistance and condenser are so chosen by Langmuir as to make the grid bias of the detector tube vary in accordance with the signal. If this resistance and condenser combination be used to obtain grid bias in a radio frequency amplifier rather than in a detector, the problem is one of obtaining a constant grid bias, not one which varies with the signal. This would require the selection of a resistance and a condenser of an entirely different numerical value from those used by Langmuir. Thus, while with the information disclosed in the Langmuir patent one skilled in the art could probably, without more, transfer the use of the resistance and condenser from the detector to the radio amplifier, such transfer and use is nowhere actually suggested by Langmuir. In short, such combination is nowhere used in Langmuir, as a hum-eliminating means, nor is it even suggested by Langmuir that it be so used.

We pass now to the fourth of the above-named alleged anticipating patents, namely, patent to Schloemilch and Von Bronk, No. 1,087,892. This patent discloses a three unit set as does the patent in suit, but it does not anticipate this patent for the following reasons: The receiver of this patent uses direct current and Lowell & Dunmore, in the patent in suit, have virtually taken this receiver, removed the sources of direct current, and replaced them as follows: First, the direct current supply to the plate is replaced by a rectifier filter combination in the patent in suit; second, instead of the direct current supply by a battery to the filament circuit, the patent in suit applies raw alternating current which necessitated the introduction of the mid-point connection and the resistor-condenser combination for obtaining grid bias, which has heretofore been explained. In other words, whereas, in a set constructed according to the specifications and claims of Schloemilch and Von Bronk which operates with direct current, some of the hum-eliminating means, namely, the radio frequency transformer and proper grid bias, are necessary for operating the Lowell and Dunmore set, nevertheless when Lowell and Dunmore substituted alternating current for direct current they introduced additional hum-eliminating means, that is to say, the mid-point connection, the resistor-condenser combination, and the rectifier-filter, which were not necessary with the use of direct current, and therefore such additional hum-eliminating means were not only not used by Schloemilch and Von Bronk, but not even suggested.

We now pass to the fifth of the above-named alleged anticipating patents, namely, patent to Colpitts and Arnold, No. 1,-388,450. This patent also does not anticipate the patent in suit for two primary reasons: First, Colpitts and Arnold make use of the passage of the plate current through a resistance to obtain a grid-biasing voltage, whereas Lowell and Dunmore do not make use of the resistance in obtaining this voltage, inasmuch as the plate current which they use for grid-biasing means is connected in the grid circuit; second, Colpitts and Arnold do not use a condenser in shunt with their grid-biasing resistance as do Lowell and Dunmore, because the Colpitts and Arnold device relates to tubes used in a transmitting device as opposed to a receiving device, the requirements of the former rendering it unnecessary to use a condenser in shunt with a grid-biasing resistor. However, such condenser is essential in connection with a resistance used for obtaining grid bias in tubes in a receiving set, since the magnitude of signals dealt with in a receiving set is so much less than that of those dealt with in a transmitting set, and it is therefore necessary to eliminate entirely any fluctuations in the grid bias voltage in the former, but not in the latter.

It will thus be seen that none of these five prior patents anticipates the patent in suit and, in fact, only three of these prior patents call for the use of alternating current, namely, White, Heising and Colpitts and Arnold, and none of these three discloses anything with respect to the use of alternating current except in relation to the radio frequency amplifier part of the set, a fact which in and of itself creates a fundamental distinction be-

tween these patents and the patent in suit, not to mention other distinctions which have been heretofore analyzed, in dealing with each particular patent.

*Prior Art Publications.*

In addition to relying upon these prior patents, defendants assert invalidity of the patent in suit on the ground that it is anticipated by disclosures in printed publications prior to conception of the alleged invention. Under section 4886, Revised Statutes, as amended (35 U.S.C.A. § 31), a person who claims invention must be denied a patent thereon, if his invention has been described in a printed publication in this or any foreign country, before the invention was conceived. In their original, preliminary statement before the Patent Office Lowell and Dunmore alleged conception on October 1, 1921, and a reduction to practice on December 10, 1921. The Supreme Court when this patent, and the two others here in suit, were before it on the question of ownership, found that the idea was conceived August 3, 1921, and reduced to practice December 16, 1921. See U. S. v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488. See, also, Id.(D.C.) 49 F. (2d) 306, and (C.C.A.) 59 F.(2d) 381. The articles primarily relied upon by defendants are the following six, all of which were published before Lowell and Dunmore conceived their invention and also before they reduced it to practice, whether we take the earlier or the later dates, with the possible exception of the last named article: (1) Article by Elliott A. White, formerly instructor in radio in Carnegie Institute of Technology, appearing in the July, 1919, issue of "Electrical Experimenter," the article being entitled "Operate your Audions on AC"; (2) article by M. Moye, in the "Wireless World" for April 2, 1921, entitled "Lighting Valve Filaments with AC"; (3) article by the same author in the issue of the same publication for May 14, 1921, entitled "The Lighting Mains as a Source of Current for Valves"; (4) article by the same author in the "Radio News" for June, 1921, entitled "AC for Heating VT Filament"; (5) article by one writing under the nom de plume of "Dr. P. C." in the French publication "La T. S. T. Moderne," in the April-July, 1921, issue, entitled "Combined Crystal and Tube Hook-ups and the Use of Power System Alternating or Direct Current for the Heating of the Filament and for the Plate Potential"; and (6) ar-

ticle by the same author in the August, 1921, issue of the same publication, with the same title.

Considering each of the aforegoing publications consecutively, in the order in which they are above listed, suffice it to say that with respect to the first, that is, the article by White, this clearly does not anticipate the patent in suit because, while it shows a radio receiving set completely operated by alternating current, the set provides for the use of only one tube. Similarly, the first of the Moye articles refers only to use of a single tube. In disclosing operation of the filament by alternating house current, the author explains that a circuit timed to the high frequencies does not respond to the low, or hum, frequencies. This article does not actually refer to a radio frequency transformer, but such is an equivalent of a circuit responsive to high frequencies. The second of the Moye articles discloses a radio frequency amplifier using only one tube and a crystal detector, all completely operated by alternating current, namely, it discloses the equivalent of the first two units of the patent in suit, namely, the disclosure is equivalent to this extent to that under the Schloemilch and Von Bronk patent, except the latter operates by direct current. The fact that Moye did not disclose any combination embracing the third unit, namely, the audio amplifier unit embraced in the combination in suit, is sufficient to prevent this publication of his from constituting, in and of itself, a complete anticipation of the patent in suit. The third, and latest, of the Moye articles discloses virtually the same circuits as were disclosed in Moye's previous articles, and, in addition, other direct current circuits which are not pertinent to the present controversy. Thus, this third article also is not an anticipation of the entire combination in suit.

Finally, the two articles by Dr. P. C. may be considered together, because they are both essentially the same and are a description in a French publication of what Moye had done, with the additional suggestion, contained in the later publication, of an improvement by connecting a crystal detector to the radio frequency amplifier through a radio frequency transformer, precisely as Lowell and Dunmore did in the present suit. A determination of what effect these articles have upon the patentability of the claims in suit requires a more analytical consideration of

these claims which will therefore now be undertaken.

Of the three typical claims of the patent in suit, namely, 1, 3, and 18, only claim 3 embraces an audio amplifier means. That is to say, the other two claims deal only with the first two units of a three-part set, namely, the radio amplifier unit and the detector unit. All three of the claims are substantially the same with respect to these first two units. That is to say, they are virtually repetitions of each other except that claim 1 embraces an additional means for effecting grid bias, not contained in the other two claims. This additional means is stated in claim 1 (after disclaimer) as follows: "(c) a resistor shunted by a condenser interposed in the circuit between the grid and cathode of the amplifying means where said condenser forms a low impedance path for both signal and power supply frequency and wherein the voltage drop across said resistor provides a negative bias for the grid of the amplifying means." Were this eliminated, it might be conceded that claim 1 would be virtually identical with the system disclosed in the articles by Moye and Dr. P. C., but this addition does represent a method of effecting grid bias not disclosed by those authors or by any of the other articles or prior patents to which our attention has been directed. Therefore it must be conceded that this is a novel method of effecting grid bias, that is, a method of combining the rectifying ability of the grid-filament circuit of the tube with a resistance-condenser filter, so that the tube may produce its own grid bias, while the tube is at the same time acting as an amplifier. But it is not a hum-eliminating means. Actually, the biasing of the grid may reduce or increase the hum, depending on the tube characteristic at the point of zero bias. The only way in which this biasing arrangement can be considered as a hum-eliminating means in a radio frequency amplifier is in so far as the bias causes the tube to operate on a straight portion of its characteristic, and thus prevents the tube from operating as a modulator and introducing what might be referred to as hum modulation. The operation of the tube on the proper portion of its characteristic curve is a requirement that must be satisfied whenever the tube is to operate as an amplifier, in order to avoid the introduction of distortion. And, of course, this is particularly important, under the alternating current operation of the

patent in suit, in order to prevent alternating voltages, present in the tube, from becoming superimposed upon the signal. Thus, the grid-biasing means prevents this type of hum from being introduced, but it must be considered rather as a grid-biasing than as a hum-eliminating means, because proper grid bias is essential to prevent the introduction of hum modulation, and it can do nothing to eliminate any hum that has been introduced in any other manner.

It is significant to note that in the case in the Third Circuit, Dr. Lee, plaintiffs' expert, in naming the hum-eliminating means in the patent in suit, did not mention such condenser-resistance units as such means. This testimony has been stipulated into the present case.

## Disclaimers

Thus it must be concluded that claim 1 discloses no new hum-eliminating means, and that, if section (c) relating merely to the method of effecting grid bias be eliminated, it is identical with the disclosures in the articles by Moye and Dr. P. C., and therefore would be void for anticipation. How, then, must we treat the effect of the inclusion of section (c)? As we have seen, it discloses something which is novel, but that novelty is not part of the claimed invention which is the elimination of hum. However, further elaboration of this distinction appears to be unnecessary, because it is certainly clear that section (c) renders the whole claim void because it is not merely new in the sense that it is an invention, but it is a new part of the claim, inserted for the first time by the disclaimer. That is to say, it cannot, as we have seen, be considered as part of a plurality of means "for eliminating the hum of said alternating current in said apparatus," because it is not a hum-eliminating means, but a means for effecting grid bias. We have seen that the disclaimer rule prohibits the introduction, without invalidating the original claim, of anything not embraced in the original claim. Claim 2, of which claim 1 is typical, is likewise invalid.

Turning to claim 3, it is significant that this claim, which is typical of claims 4 and 7, differs fundamentally from claim 1, just considered, and which we have seen is typical of claim 2, in that, unlike claims 1 and 2, it includes audio frequency amplifier means, that is, all three of the units in a three-part system. As to the

radio frequency and detector units, the claim is merely a repetition of claim 1, with the exception that section (c) of claim 1, heretofore considered, is eliminated, and therefore, as we have seen, in so far as it is a repetition of claim 1, claim 3 is anticipated by the articles of Moye and Dr. P. C. As to the audio frequency amplifier means mentioned in claim 3, which is covered merely by the following words, "means for amplifying said energy at audio frequencies," we find, as did Judge Morris in the case in the Third Circuit, 34 F.(2d) 450, that nowhere is such means previously disclosed in combination with a radio frequency amplifier and detector units *completely* operated by alternating current. True, this combination is found in Schloemilch and Von Bronk, but there operated by direct current. True, also, the operation in White is by alternating current, and there we have the same combination, but it is embraced in a transmitter and not a receiver. In Heising, the filament is operated from alternating current. No question arises over disclaimer because, as has just been pointed out, section (c) of claim 1 is omitted from claim 3. This is true also of claim 4, but not of claim 7.

Thus, to summarize, we have this situation: Claim 3 is, it is true, novel in the fact that the audio frequency amplifier is operated completely by alternating current, in combination with the other two units, also so operated. However, we do not consider that such is "new" in the sense that it entitles the plaintiffs to a patent on their combination. A mere aggregation of old elements is not patentable unless they are combined so as to accomplish some new result. Richards v. Chase Elevator Co., 158 U.S. 299, 15 S.Ct. 831, 39 L. Ed. 991; Powers-Kennedy Co. v. Concrete Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278, and cases cited. We believe that no "new result," as that phrase must be used in patent law, is here accomplished. With all that the prior art disclosed to Lowell and Dunmore, not merely with respect to the radio amplifier and detector, but also with respect to the general operation of vacuum tubes, to wit, patents to White and Heising and the White, Moye and Dr. P. C. and other articles showing the application of alternating current to the filaments of a vacuum tube, and the application of rectified alternating current to the plate, it did not require inventive genius to operate an audio frequency amplifier

from alternating current, but merely ordinary ability of one skilled in the art. This being true, the addition of an audio frequency amplifier unit, operated by alternating current, to a combination of the other two units, also so operated, which latter combination we have seen is old, cannot produce a "new" combination.

For the same reasons claims 4 and 7, of which claim 3 is typical, must be held invalid, claim 7 being also invalid because of disclaimer.

We now turn to a consideration of the third and last of the typical claims in suit, namely, claim 18, typical also of claims 13 and 14. This claim contains no reference to an audio frequency amplifier unit, and is substantially the same as claim 1, except it does not provide the method of effecting grid bias specified in section (c) of claim 1. Nor does claim 14; but claim 13 does. However, as we have seen, if this section of claim 1 be excised from it, it would be invalid because of anticipation by prior art publication. Therefore claim 18, for the same reason, and also 13 and 14 are invalid. Claim 13 is also invalid because of the disclaimer.

It will thus be seen that, in finding invalid all of the eight claims in suit of patent No. 1,455,141 to Lowell and Dunmore, we rest this finding directly upon prior art anticipation, and also upon a forbidden use of the disclaimer with respect to claims 1, 2, 7, and 13, rather than upon the exact ground upon which the Circuit Court of Appeals for the Third Circuit found two of the claims of this patent which are now in suit, namely, claims 3 and 14, invalid. That court found that Lowell and Dunmore had done nothing more than taken old instruments and had used each to perform its own well-known function and no other, and that therefore what they had produced was no more than an aggregation of separate results; that each hum-eliminator performed, in the operation of the combination, the same function it performed in the unit from which it was taken, that is, that each did its own work in its own section and no more, with the result that the operation of all the eliminators was merely an aggregation of separate results, all admittedly obtained by prior art means. The precise ground upon which the Circuit Court of Appeals for the Third Circuit rested its decision may perhaps best be clarified by quoting again the following passage from its opinion, in which it states what

would have been invention had it found such to have existed, 59 F.(2d) 305, 307, 308: "It might be invention if, when operating, some hum should develop in the first section and pass over to the second section, or if hum in these two sections should invade the third section and be suppressed before it reaches the loud speaker by the three hum eliminators coacting to that end. In other words, there might be invention if the hum eliminators, though separately placed, functioned together on the circuits of all sections in eliminating wandering hum. There is, however, no suggestion of such hum action, and no such interrelation or coaction of separately placed hum eliminating means is claimed for the invention. Instead of doing anything like this, the plaintiffs themselves claim that the hum is killed 'at the source' —at the mid-point connection—that each eliminator stops hum in the tubes in its own section, or, rather, as we look at it, each eliminator prevents hum from developing in the tubes with which it alone is connected, leaving nothing for the other eliminators connected with the other sections to do with the tubes of its section or with hum in them."

Whether the above is an accurate restatement of what plaintiffs claimed in the previous litigation, we are not called upon to determine. In the present suit, the plaintiffs have made it clear that such is not their contention, but that, on the contrary, they contend, and in this they are supported, at least in some measure, by the demonstrations or tests that were conducted in the course of the trial, that hum developing in the first unit does pass over to the second unit, and so on; that hum is not avoided merely by mid-point connections, and that they rely upon the functioning, con-jointly with mid-point connections, of the resistor shunted by a condenser in both amplifier units of the set, for the purpose of eliminating hum; and likewise upon the con-joint functioning of the humless detector and draining means in the detector unit of the set, as well as upon the radio frequency transformer between the amplifier and the detector. We prefer, however, to rest our decision that the claims are invalid squarely upon the ground that (1) conceding that they constitute a combination as opposed to a mere aggregation of elements, still the combination is not new, because anticipated by prior patents and publications; and (2) with respect to claims 1, 2, 7, and 13, disclaimers render them invalid also, all as set forth in detail above.

### Infringement.

Having thus found that the claims in suit are invalid, it becomes unnecessary to consider the question of infringement. However, because of the importance of the present litigation and the full treatment which was given to the infringement branch of the case at the hearing in this court, it is deemed advisable to give, at least in summarized form, this court's views respecting the question of infringement.

A comparison of the model of defendants' set with plaintiffs' model—both in evidence—unquestionably shows the following basic similarities: Both sets are powered by alternating current; both receive a weak modulated signal; both have interfering power frequencies; both strengthen the signal without distortion of modulation; both strain out the power frequencies before passing the signal on to the detector; and both amplify the signal in the audio amplifier section while keeping out, or reducing, interfering power frequencies which tend to enter that portion. However, a more analytical comparison brings us at once face to face with a vital distinction which is that, even assuming (although, as will be seen, we decide otherwise) that plaintiffs are entitled to employ indirectly heated cathode tubes as equivalents of the tubes known to the art at the time their invention was conceived and patented, defendants employ, preceding the radio frequency amplifier portion of their set, two additional tubes of the indirectly heated cathode type which make their receiving set a so-called super-heterodyne receiver, namely, such tubes serve the purpose of reducing the frequency of the incoming wave before its application to the radio frequency amplifier portion of the receiver. Plaintiffs' set does not have this combination, and the distinction is a material one. Likewise, defendants' set employs in the detector portion an indirectly heated cathode tube, whereas the specifications of plaintiffs' patent call for the use of "a rectifier of the crystal detector type," and while, as will be hereinafter more precisely explained, provision is made for employing other forms of rectifiers, the type of indirectly heated cathode tube used by defendants was not commercially available at the time plaintiffs' patent was

either applied for or granted, and such three electrode tubes as were commercially available at such time were understood by plaintiffs to be objectionable for use in their set. Therefore the other forms of rectifiers referred to must be understood as meaning the electrolytic, magnetic, or microphonic forms known to the art at the time, and which, like the crystal, did not require a battery or other local source of energy.

Furthermore, while defendants' set employs in both amplifier portions, in the grid circuits, a resistance shunted by a condenser, in lieu of connecting the grid to the mid-point of a resistor across the heated filament, there is again employed an indirectly heated cathode tube, which gives added emphasis to the question whether such tube can fairly be claimed to be a permitted substitute for the mid-point connection or potentiometer, and, indeed, whether it can fairly be said to be a permitted substitute, when used in the other instances just referred to, for the specific instrumentalities called for by the specifications of plaintiffs' patent.

Plaintiffs' reply to the aforegoing is substantially as follows: That defendants admittedly use the hum-eliminating instrumentalities which they, the plaintiffs, use in their device, or their equivalents, and the defendants should not be permitted to escape the charge of infringement by the argument that such use is in reality not needed because the indirectly heated cathode tube operates without hum, plaintiffs asserting that hum elimination in defendants' set is not, in fact, due to use of the indirectly heated type of tube, for the three following reasons: First, because such tube was known at least ten years before the date of plaintiffs' invention; and yet no one came forth with a commercially successful receiving set, operated by alternating current, until 1927, when, as plaintiffs claim, their invention was copied by the Radio Corporation of America and other large manufacturers; second, because the tests made in the course of the hearing before this court demonstrated that, notwithstanding defendants' use of such tube, the simple removal of the resistor shunted by a condenser, and the mid-point connection, in either radio or audio amplifier portion of the defendants' set, resulted in producing a very aggravated hum; and, third, because in the original set of the plaintiffs', introduced in evidence, directly and not indirectly heated tubes

are employed throughout, and the performance of this set compares today favorably with that of defendants' model.

Taking up these three grounds in the order stated, as to the first, it must be conceded, on the evidence presented, that tubes of the indirectly heated type were known some ten years before the date of the Lowell and Dunmore invention, but it has not been shown that they were either perfected or commercially available. It appears that a satisfactory indirectly heated tube did not make its commercial debut until 1927, with the advent of the so-called AC tube. But, apart from this fact, plaintiffs' specifications of their patent, when correctly interpreted, do not contemplate the use of either directly or indirectly heated tubes in the detector portion of their receiver. On the contrary, it is apparent that plaintiffs believed, and so stated both in their specifications and before the Patent Office, that such use was not satisfactory. For example, although, as has already been noted, the specifications of the plaintiffs' patent (page 2, lines 35 to 37) recite that forms of rectifiers, other than crystals, may be readily employed, the specifications proceed to state as follows (page 2, lines 48 to 59): "The employment of a crystal detector in place of the electron tube detector reduced the 60 cycle hum very considerably. When an electron tube is used as the detector, there is impressed on both the plate and the filament a 60 cycle AC voltage which although small, becomes very objectionable when amplified by one or two stages of audio frequency amplification. When the crystal detector is used, no 60 cycle voltage is supplied to the detector circuit." Likewise it is in evidence that, before filing their patent application, Lowell and Dunmore stated that the use of a crystal detector is very objectionable because of its instability, and that they conducted numerous tests for the purpose of determining whether such type of tube as was then available could be more successfully utilized in place of the crystal, but they stated that they had to give up the idea of using a tube detector.

Thus it is only reasonable to assume that, although in their specifications plaintiffs state that "other forms of rectifiers may be readily employed," they not only met with no success in the employment of such other forms of rectifiers as were available at the time, but also that such as were available were not the indirectly

heated cathode tube such as defendants employ in their set, because such did not become perfected and available until 1927. In short, while plaintiffs' model embraces an indirectly heated detector tube of the type employed by defendants in their model, such use does not and cannot read on the specifications of the patent.

As to plaintiffs' second contention, namely, that the tests made in open court demonstrated that, notwithstanding defendants' use of indirectly heated tubes, the simple removal of the resistor shunted by a condenser, and the mid-point connection in either the radio or audio amplifier portions of their set produced an aggravated hum, suffice it to say that such may be admitted, and still the argument evades the real question involved in the charge of infringement, namely, whether the use of indirectly heated tubes may properly be said to be the equivalent of what is specified in plaintiffs' patent to be used in phases of operation where, in corresponding phases, defendants use such tubes.

Plaintiffs' third contention, namely, that it has been demonstrated that one of their sets, constructed for operation with directly heated tubes throughout, compares favorably in performance with defendants' set employing only indirectly heated tubes, may likewise be conceded, and yet such concession proves nothing, because it evades the real issue just explained.

In the indirectly heated cathode tube, there is no need for a mid-point or mid-tap connection by potentiometer or otherwise, because the cathode of such tube does not have alternating current passing through it. The older type of tubes, with the filament directly heated by alternating current, produced much hum, as we have already seen, unless the grid and plate were connected to the middle of the filament instead of to each end, and even then they still had sufficient hum to interfere with their operation as detectors. On the other hand, the indirectly heated tubes have no alternating current in the cathode, but instead an entirely separate circuit is provided whereby the cathode or filament is heated by radiation from a separate, heater-wire, through which the alternating current passes. At the time of the plaintiffs' patent, there was no real problem in operating either amplifier section, that is, either amplifier tube by alternating current. The device of the mid-point connection, which, as we have seen, was then old in the art, was sufficient for that pur-

pose. However, when such tubes as were then known were used as detectors, satisfactory results were not obtainable with the mid-point connection. Such was an established fact in the art at the time.

Thus we conclude that it is not reasonable to say that defendants, in using something which was not only not available to plaintiffs at the date of their invention, but was materially different in construction and operation from what was available, but which later resulted in a commercially satisfactory detector-tube, are merely using the equivalent of what plaintiffs used or now have a right to use. The fallacy of this statement becomes all the more obvious from plaintiffs' admission that what they originally used under their patent, namely, crystal detectors and such tubes as were then available, were both unsatisfactory, and from the fact that in the model in suit they have employed the indirectly heated tube.

In this connection it is illuminating to quote the following from Judge Woolley's opinion dealing with this same question, 59 F.(2d) 305, 307: "There is a question, serious enough to justify the contest that arose from it, whether the patentees really contemplated hum elimination in a receiving set in which all the amplifying and detecting means are vacuum tubes, which now everybody uses. In their experiments, as shown by their notes, they discarded vacuum tubes for detectors, stating they developed objectionable hum, and resorted to a crystal detector and condenser which worked without applying alternating current to the detector circuit. Though employing a crystal detector, the patentees, we shall assume with some hesitation, saved the claim and included tube detectors by saying, 'although other forms of rectifier may be readily employed.' Anyhow, if not restricted by the specification, the claim, referring to the elimination of hum in the 'rectifying means,' is broad enough to cover detectors of the latter class."

### Dunmore Patent No. 1,635,117.

We now turn to a consideration of the second patent in suit, namely, patent to one of the plaintiffs, Dunmore, No. 1,635,117, on application filed February 27, 1922, issued July 5, 1927. This patent is called one for a signal receiving system, but, as previously stated, it will be referred to as the "grid" patent, because it relates particularly to putting a bias upon, that is, giv-

1014

ing a negative potential to, the grid of a three electrode tube from a source of alternating current. Of the twelve claims of the patent, only three are here in suit, namely, 9, 11 and 12, 9 and 11 being typical. They read as follows in the original patent, certain modifications which were made by disclaimers being hereinafter more specifically referred to:

"9. A signal receiving system comprising in combination an audio frequency amplifier including an electron tube having grid, filament and plate electrodes, an input circuit interlinking said grid and filament electrodes, an output circuit interlinking said plate and filament electrodes, a source of alternating current, means for rectifying said current, means for supplying a negative potential to the grid electrode of said electron tube from said source of alternating current, and means for supplying a positive potential to said plate electrode from said source of alternating current, whereby said audio frequency amplifier operates to amplify signaling energy without interference from said source of alternating current."

"11. In a direct current supply source for vacuum tubes and the like, the combination of a source of power adapted to be energized by alternating current or the like, means for converting such current into current of constant duration, means for smoothing out fluctuations in such current comprising a filter and a resistance connected across the output side of said filter and output terminals connected at opposite terminals of said resistance, said resistance being of such value that the current flowing therethrough is relatively large with respect to the current supplied to the load."

"12. A method of energizing thermionic vacuum tubes or the like from a source of alternating current, which comprises rectifying such alternating current to produce fluctuating direct current, filtering out fluctuations from such fluctuating current, passing such filtered currents through a resistance to produce a voltage drop therethrough and impressing the desired portion of such voltage drop upon said thermionic tube."

The specifications and drawings of the patent deal only with the audio frequency amplifier section of the receiving unit. The means employed in the patent to obtain the grid potential without interference

from the source of alternating current consist of a transformer connected through its primary winding with the current source; a secondary winding; a rectifier; a condenser to smooth out the rectified current connected across the output terminals of the rectifier; and a resistance of desired value also shunted across the output circuit of the rectifier. It is this resistance that causes the drop in potential, and creates the desired negative potential or bias on the grid.

It is essential with radio tubes, in respect to grid bias, that the current shall be steady, as has been explained in relation to the patent first considered, namely, patent to both of the individual plaintiffs in this suit, Lowell and Dunmore, No. 1,-455,141. In the early stages of the radio art, such steady current was supplied by what was known as a "C" battery, because, if alternating current were applied to the grid connection, the bias of the grid would be alternately positive and negative, and the tube would not function as desired. Shorn of more technical language, the invention which Dunmore claims is his, as evidenced by this patent, is that, by the use of a resistance shunted by a condenser, he has provided a new instrumentality whereby there is applied directly to the grid circuit a pulsating current, and yet the same is made to give a steady potential to the grid without interfering with the signal; that is to say, that the device does not merely consist of adding two old devices together, namely, a resistance and condenser, nor in substituting the source of one power for that of another, namely, alternating for direct current, but rather that it consists in bringing together old elements into new co-operative function; that it rectifies or converts alternating current into *workable* direct current.

It appears to be true, as plaintiffs contend, that no one prior to Dunmore had ever converted alternating current into direct current and used it to energize the plates and to negatively bias the grids of audio frequency amplifiers in a receiving system, although all of the elements used to accomplish this were admittedly well known in the art at the time of Dunmore's alleged invention. The conversion of alternating current into smooth direct current, suitable for use in radio sets, as well as the use of transformers, rectifiers, condensers, and resistances in such sets, was well known. We have already pointed out that plaintiffs contend that Dunmore's

alleged invention is essentially more than the substitution of one kind of power for another kind, namely, alternating current for direct current, or the substitution of the *source* of the one kind of power for that of the other. Were this the only basis of the alleged invention, it would be without substantial merit, for such substitutions do not have the quality of invention. See Shaw Electric Crane Co. v. Henry R. Worthington (C.C.) 77 F. 992; Shaw Electric Crane Co. v. Shriver (C.C.A.) 86 F. 466; National Regulator Co. v. Powers Regulator Co. (C.C.A.) 160 F. 460. The claim made for the patent is, as we have seen, much more than this—more than the substitution of power with certain characteristics for the same power with other characteristics—it is that it was invention to convert alternating current into direct current and then to use it, not only to energize the plate of audio frequency amplifiers, but also to negatively bias the grid of such amplifiers, which never had been done before.

In order to determine whether such conversion and use of alternating current is entitled to be given the dignity of an invention, we must first examine the prior art.

### The Question of Validity.

*Prior Art Patents.*

Defendants have cited eight prior art patents and seven prior publications, all of which are alleged to anticipate either separately or collectively the alleged novelty of the Dunmore patent. These eight patents are the following: To White, No. 1,195,632, on application filed August 23, 1915, issued August 22, 1916; to Heising, No. 1,432,022, on application filed October 11, 1916, issued October 17, 1922; to Mathes, No. 1,426,754, on application filed October 23, 1916, issued August 22, 1922; to Scriven, No. 1,375,739, on application filed June 27, 1918, issued April 26, 1921; to Wilson, No. 1,403,932, on application filed July 16, 1919, issued January 17, 1922; to Gabriel, No. 1,488,489, on application filed December 23, 1920, issued April 1, 1924; to Robinson, No. 1,587,084, on application filed November 1, 1920, issued June 1, 1926; to Hull, No. 1,251,377, on application filed December 22, 1915, issued December 25, 1917.

Considering separately each of these patents in the order in which they are above listed, the patent to White discloses amplifiers operated by alternating current, but discloses no means for maintaining a negative grid potential from the alternating current source. Thus White is clearly not directly anticipatory of Dunmore. Heising discloses substantially the same operation, but without disclosing any means for obtaining a negative potential on the grid from an alternating current source. Mathes and Scriven both employ resistances to obtain negative grid potentials, but their sets are also operated by direct current, so cannot be said to anticipate Dunmore. Wilson discloses how to obtain negative grid bias by means of a resistance inserted, in series, in the plate return circuit of battery-operated tubes, the drop in potential across the resistance being supplied to the grid. Thus Wilson does not anticipate Dunmore, because he also does not disclose the use of alternating current to obtain a negative potential on the grid. Gabriel discloses means for obtaining grid bias from rectified alternating current, but such means as are employed are designed to provide a *varying* grid bias, whereas Dunmore calls for a *steady, constant* grid bias. Robinson discloses the use of a resistance through which the plate current of the tube flows, the source of that current being a battery, and the voltage drop across this resistance is used to obtain grid bias. He has also employed a condenser shunted across the resistance, in order to exert a smoothing effect, and to maintain a steady grid bias, even though the plate current may be pulsating. That is, we here find the condenser-resistance combination of the Dunmore patent serving to supply grid bias from a pulsating current. In short, here is a disclosure more akin to Dunmore than the disclosures in the other patents just considered, but still alternating current is not the source of power.

Finally, however, in Hull, we see a disclosure very much more analogous to Dunmore. The Hull patent, which is called a "method of and means for obtaining constant direct-current potentials," discloses an alternating current source, a transformer with primary and secondary windings, a rectifier to convert alternating current into direct current, and a condenser used to filter or smooth out the fluctuations of the current thus rectified. The patent does not speak of using any grid bias, but does, however, contain the statement that the scheme will produce a steady direct current from an alternating current source, and may be used "in any organization in

which the current may be utilized." We conclude that it was not invention for Dunmore, having before him Hull's disclosure, merely to apply such disclosure to an audio frequency amplifier tube, for the purpose of effecting grid bias.

*Prior Art Publications.*

Turning now to the seven articles which, as already stated, are cited as anticipations of Dunmore, these articles are the following and all were published prior to the date of alleged conception of the invention: Article by Dr. P. C. in the April-July, 1921, number of "La T. S. F. Moderne"; three articles by Moye in the "Wireless World" for April 2, 1921, "Wireless World" May 14, 1921, and the "Radio News" for June, 1921; article by L. R. Felder in the "Radio News" for September, 1921; article by Jerrold Swank in the "Radio News," same issue; and, lastly, article by John F. Bront in the "Experimenter's World" for August, 1921.

The Dr. P. C. and Moye articles have previously been considered in relation to the "receiver" patent in suit. Suffice it to say that, with respect to the "grid" patent now under consideration, these articles do not disclose the precise grid-biasing combination employed by Dunmore. Felder discloses a single tube rectifier with a condenser connected across its output, but does not show the shunt-resistance of Dunmore, although there is carefully explained the smoothing action of the condenser, and its co-operative action with a resistance, or load, shunted across it. Swank discloses plate voltage supplied from rectified alternating current, using a smoothing condenser, shunted by a resistance, i. e., a combination similar to Dunmore, but used for the plate and not for the grid. Lastly, Bront is much closer to Dunmore except his article relates to a transmitter and therefore grid bias is not supplied from a rectifier-filter combination because the tube, acting as a transmitter, supplies its own bias. Bront also uses a full wave rectifier and a more elaborate filter, but these differences are not vital to the present inquiry. We conclude that, with the Bront article before him, it can scarcely be said to have been invention for Dunmore to have accomplished grid bias as he did, with the use of alternating current. In any event, as already stated, we believe that there is a definite anticipation of Dunmore by the Hull patent

Plaintiffs stress the fact that a condenser and resistance combination, when used in place of a Hull filter (which is an efficient combination of condensers and coils for smoothing out pulsating uni-directional current), prima facie calls for a condenser of very large size. This fact, plaintiffs claim, repelled from the mind of any one before Dunmore the thought of using the resistance-condenser combination, and so they maintain that Dunmore was the first to use a condenser and resistance combination, and to appreciate the fact that a large condenser was not necessary, due to the co-operative action of condenser and resistance. In support of this contention, plaintiffs call attention to the two eight microfarad (one millionth of a farad, the unit of electric capacity) condensers required in the Hull filter of defendants' set, as compared with the .25 microfarad condenser required for the grid biasing resistance of this same set. Plaintiffs, however, fail to call attention to the fact that the small .25 microfarad condensers in the grid-biasing circuit are of such small size because advantage has been taken of the filtering action already obtained by the use of the Hull filter. This conclusion is obvious. Plaintiffs' argument is made prima facie the more plausible because the patent does not specify the exact size of the condenser, and also because the construction of plaintiffs' model, which is in evidence, does not conform strictly to the patent specifications.

*Disclaimers.*

At this point it is appropriate to consider the disclaimers applicable to the three claims of the "grid" patent in suit. Just as with respect to the claims of the "receiver" patent in suit, defendants assert that these disclaimers render the claims invalid, because they have added new elements to the claims and have changed the character of the invention for which the patent was originally granted.

With this contention of defendants we cannot agree, in so far as claims 11 and 12 of the "grid" patent are concerned. These claims originally, in their broad form, called for the use of rectified and filtered alternating current; for the passing of such current through a resistance and applying the voltage drop upon the tube. In view of what Hull and Bront had, as we have seen, previously disclosed, such a broad claim could not be sustained. The disclaimers, however, re-

strict the use of the rectifier-filter-resistance combination to the grid circuit. Thus the claims, so narrowed, appear to provide for no more than obtaining a substantially direct current voltage from a source of alternating current, instead of from a battery, and supplying it to the grid.

However, we believe the situation to be otherwise with respect to claim 9. Originally, that claim called for a "means for supplying a negative potential to the grid electrode of said electron tube from said source of alternating current." In the light of the specifications, the "means" referred to must be taken to require a source of alternating current, a rectifier, a condenser, and a resistance for supplying the grid bias only. The disclaimer, however, limits the "means" to "a bias determining resistance connected in a series path between the grid and filament electrodes and shunted by a condenser of low impedance to power supply frequencies." Thus any necessity for the separate rectifier tube appears to have been eliminated and the use of the resistance and condenser alone substituted, which is clearly not in accordance with the specifications, and represents a material departure therefrom, because, before disclaimer, the amplifier tube was biased from an external source, i. e., the rectifier tube. But, when this latter tube is removed by the disclaimer, the amplifier tube becomes self-biasing, that° is, it must furnish its own bias. Incidentally, it is worthy of note that it is the method actually employed in the "receiver" patent here in suit. Thus we conclude that claim 9 is rendered invalid by the disclaimer, apart from the other reasons already given for finding it invalid along with the two other claims here in suit.

### Infringement.

Since we find the "grid" patent to be invalid, it becomes unnecessary to consider whether or not defendants' grid-biasing means infringes this patent. However, we will state that we do not think there is infringement, because defendants use the plate current of the tube system itself to tap off voltage for the grid, i. e., they use a self-bias method, in which the bias-resistor is in a circuit which is common to both plate and grid. This is not the method called for by the only claim (No. 9) in suit which prima facie might be considered as calling for a self-biasing method, since that claim (after disclaimer) requires a "bias-determining resistance connected in a series path between the grid and filament electrodes." In short, whatever the advantages may be in the Dunmore idea of making the operation of the grid independent of the plate current, defendants do not do this, and therefore they do not infringe.

Parenthetically, we call attention to defendants' assertion that it is significant that Dunmore does not employ the grid-biasing method of this patent in either of the tube systems of the two other patents now in suit. This statement is not, however, of real significance, because Dunmore's method is suitable where larger values of negative bias are required than are obtainable from the currents of the tube itself. These larger values were not needed in the circuits of the first patent in suit, because the tubes used therein required very small valves of negative bias for proper operation.

Should it still be asserted that there is infringement of claim 9 of this Dunmore patent by the audio amplifier unit of defendants' set, even if not by their radio amplifier unit, on the theory that bias is obtained in defendants' audio amplifier unit by passing rectified and filtered current through a resistance-condenser combination, suffice it to say that this rectified current in defendants' unit comes from the rectifier-filter supplying current for the plates, whereas neither claim 9 of the Dunmore patent, nor any of the pertinent drawings or specifications, calls for this combined use. The two methods are so distinct as not properly to be considered as equivalents.

Finally, our consideration of the "grid" patent may be closed by pointing out that claim 9 of this patent—which was the only claim before the Delaware courts—was held both valid and infringed, by the District Court [see 34 F.(2d) 450], but on appeal this ruling as to validity was reversed largely, though not solely, upon the Hull patent, and the question of infringement was not passed upon. See 59 F.(2d) 309.

### Lowell and Dunmore Patent
### No. 1,606,212.

We turn now to the third and last of the patents in suit heretofore referred to as the "speaker" patent, since it relates particularly to the loud speaker part of the receiving set. The patent has nine claims, all of which are in issue. They were all held valid and infringed by this court at the prior hearing, but, as pointed

out in the early part of this opinion, the appellate court declined to pass upon this patent on the ground that its subject matter was so closely allied with that of the other two patents in suit, it felt it unwise to pass upon the merits until the whole controversy were presented. Therefore the appellate court, in remanding the case to this court, granted leave to the parties to have the case retried as to this "speaker" patent. See Lowell v. Triplett (C.C.A.) 77 F.(2d) 556, 565. Defendants have introduced some new testimony, while plaintiffs have not.

Claims 2, 3, 4, and 6 of this patent were involved in the litigation in the Third Circuit, and were held not to have been infringed, the District Court thus finding it unnecessary to pass upon the validity of the claims. No appeal was taken from this finding of the District Court. See 34 F. (2d) 450.

Of the nine claims, 2 and 6 may be taken as sufficiently typical, claim 2 being typical of claims 1, 3, 4, 5, 7, and 8, and 6 being typical of claim 9. Claims 2 and 6 are as follows:

"2. In an apparatus for the reproduction of sound a thermionic vacuum tube amplifier, an input circuit, an output circuit, a power source of alternating current, means for rectifying said current, a loud speaker reproducer connected in said output circuit and comprising an armature winding and a field winding and circuits for supplying said rectified current to said output circuit and to said field winding, said windings being connected in such relation that disturbing current effects in said loud speaker reproducer are substantially eliminated."

"6. In an apparatus for the reproduction of sound, a thermionic vacuum tube amplifier, an input circuit, an output circuit, a power source of alternating current, means for rectifying said current, filters for reducing the hum of the rectified current, and supplying said rectified current to said output circuit, a loud speaker in said output circuit for reproducing the signal energy and means connected to said loud speaker and associated with said power source for opposing the residual hum of the rectified current."

Shorn of technical language, the object of this patent may briefly be stated to be the conversion cf the audio frequency pulsations of the audio amplifier unit of a radio receiving set into sound vibrations in tone and volume satisfactory to the hu-

man ear. The device is, in principle, the same as the output or ear device of the telephone. The unit includes a plurality of vacuum tubes connected in circuit for audio frequency amplification, and a loud speaker employing a coil armature and an electro-magnetic field coil.

Current electricity always produces a magnetic field, and as the pulsating current of the amplifier output circuit passes through the armature coil, an electro-magnetic field is also set up by that coil. The fluctuations of that field correspond with the pulsations of the current by which that field is produced. Such fluctuations, when opposed to the field, or pull, of the electro-magnetic field coil, impart vibrations to the armature coil, and so to a diaphragm connected therewith, proportionate to the current pulsations in the amplifier output circuit, and thus the audio frequency vibrations of the current are converted into sound. Until about 1918 the ordinary telephone receiver was employed, which meant that the reproduction was weak, and ear pieces had to be used. Then the permanent magnet type of receiver, having a weak but constant field, appeared. About 1920 there was placed on the market the so-called Magnavox, in which the output circuit from the receiving set passed through an armature coil suspended in the field of an electro-magnet, the coil of which was energized by a battery. But this fell into disuse because of its power requirements, and thereafter the art directed its efforts primarily to improvement of the permanent magnet type of loud speaker. Lowell and Dunmore, however, concerned themselves with endeavoring to work out a method whereby ordinary houselighting alternating current might be used. This necessitated the employment of means sufficient to overcome the hum inherent in such current. Thus the novelty claimed for the patent lies in reduction of this hum by having the hum currents in the field coil of the speaker neutralize the hum currents in the voice coil.

The patent recites that the two systems are so arranged that pulsations in the field coil are effectively opposite in phase or direction to the phase or direction of the pulsations in the output circuit or voice coil of the loud speaker, so that there is a tendency for the disturbing currents to be neutralized in the loud speaker. The means employed consist of a rectifier, a filter or condenser, an inductance coil to minimize the pulsations in the rec-

tified current, mid-point connections in the grid circuit, and a separate armature coil circuit. In the field circuit, the means employed are a half wave rectifier tube and the field coil itself to neutralize the pulsations and hum frequency variations in the field-coil current.

### The Question of Validity.

*Prior Art Patents.*

 After a re-examination of the testimony introduced at the former hearing, as well as of the new evidence that has been presented, we reach the same conclusion as we did formerly, namely, that the patent is valid, because we find that Lowell and Dunmore were the first to obtain satisfactory reproduction of sound from an audio amplifier unit, energized by alternating current. What they disclosed by their patent is not mere substitution of power. The alternating current is not the equivalent of battery current, because not filtered out as much as, for example, is the case in connection with the "grid" patent involved in the present suit (patent to Dunmore No. 1,635,117), heretofore considered. That is to say, Lowell and Dunmore in this "speaker" patent still use pulsating current which has become unidirectional, whereas in the "grid" patent, substantially steady current is used. But aside from this distinction the invention of the "speaker" patent rests on the co-operative phase opposition. The only prior patent cited is that to Pridham and Jensen, No, 1,105,924, on application filed August 20, 1913, issued August 4, 1914, but this does not anticipate Lowell and Dunmore because while it has phase opposition, it obtains it by a divided armature coil (and, if desired, also by a divided field coil, although the latter is not necessary). Lowell and Dunmore use phase opposition between the hum-producing currents in the armature coil and field coil, whereas Pridham and Jensen permit the fluctuations in the field-coil current to act on two separate portions of the armature, both of which are fastened to the diaphragm, and the pull of one portion of the armature due to a given field current fluctuation is balanced and neutralized by the pull of the other portion of the armature. Or, expressed somewhat differently, in Lowell and Dunmore, phase opposition is accomplished *electrically* and the disturbing currents are not permitted to exert any force on the diaphragm; whereas, in the Pridham and Jensen patent, phase opposition is accomplished *mechanically*, namely, the disturbing currents are permitted to exert equal and opposite forces directly upon the diaphragm. We believe that the distinction justifies our holding that what Lowell and Dunmore did rises to the dignity of invention.

### Infringement.

 Whether there has been infringement is to be determined by the results of the experiments conducted in court, and also by the inferences proper to be drawn from the credible testimony.

First, as to the experiments which were conducted with respect to two of defendants' devices, it was very apparent that as to one of them, when the connections to the field coil were reversed, some increase in the hum resulted, that is, when there was no phase opposition; and that the opposite result was produced when the same reversal was applied to the defendants' other device.

Next, as to the testimony, that of defendants is uniformly to the effect that (1) it made no difference in defendants' sets which way the field-coil connections were placed, and (2) that no specific instructions were given in the factory as to the manner in which the connections should be made. It nevertheless appears that color-coding was sometimes used, and the natural inference from this is that it was used in order to assure a fixed relationship between component parts. Thus, this fact, coupled with the demonstrations in court, compels the further inference that phase opposition was a motive. Also some of the blueprints of defendants' device, which are in evidence, disclose color-coding.

In the alleged infringing device which was before the District Court in Delaware, phase opposition was obtained indirectly, as witness the following taken from Judge Morris' opinion, 34 F.(2d) 450, 461: "Plaintiffs expressly concede that there is no co-operation between defendant's amplifier and loud speaker to neutralize or eliminate directly by phase opposition the hum-producing fluctuations. They assert, however, that defendant, through equivalents, employs the means of the claims to produce the result of the patent. But defendant's device is designed to eliminate from the amplifier circuit and from the field coil circuit any and all hum-producing fluctuations there present, and to leave no residual fluctuations to be neu-

tralized by co-operation between the amplifier and loud speaker. The means used by defendant to make its field coil current steady and pulsationless, and to shield its armature coil from the effect of residual fluctuations or magnet leakage, include, in addition to the impedance and skin effects of the coil itself, a full-wave rectifier instead of the half-wave rectifier of the patent, a filter to smooth out the ripples in the rectified current, a pot magnet, the placing of the armature· coil in as noninductive relation as possible to the field, and copper rings to shield the armature coil from the effects of any surviving current pulsations.

"Defendant's mode of operation is the direct antithesis of that of the device of the patent, which intentionally employs neutralization by direct phase opposition. Plaintiffs, however, insist that ripples of hum frequency in the current of the field winding cause magnetic fluctuations that produce eddy currents in the copper rings; that the same results flow from alternating current variations in the armature coil, and that these currents are in opposed phase relation to the producing currents and consequently bring about opposed phase relationship. But even if this theory be sound, and its soundness is questioned, the phase opposition of the patent is direct, not echoed."

In other words, the relative direction of connection of the field and armature coils was immaterial in the alleged infringing device in the Delaware suit, but not so in the present case, where the phase opposition in defendants' device is obtained directly.

It is admitted that defendants use a very complete filtering system. Further, it may be conceded that such use eliminates the necessity for phase opposition, but, as was said by this court in its previous opinion respecting this patent, the fact that one may infringe poorly does not absolve him. Also the fact that improvements in filters may have destroyed the commercial value of plaintiffs' patent does not warrant our not giving to it due recognition in this suit.

Finally, therefore, we find no reason to modify our previous ruling with respect to this "speaker" patent that it is both valid and infringed. No question of disclaimer is here involved, as was involved· in the other two patents in suit. Nor do we think that there is any merit in the contention made at the previous hearing, and also raised before Judge Morris (but rejected, at least inferentially by him), that the patent in suit is rendered invalid by the fact that it was amended March 27, 1926, when, for the first time, the question of phase opposition was brought into the claims, namely, new matter alleged not to have proper foundation in the specifications.

Conclusions.

1. The "receiver" patent to Lowell and Dunmore, No. 1,455,141, is invalid for want of patentable invention with respect to all of the eight claims in suit, namely, claims 1 to 4, 7, 13, 14, and 18. Claims 1, 2, 7, and 13 are also invalid because of improper disclaimers. None of these eight claims is infringed by the defendants.

2. The "grid" patent to Dunmore, No. 1,635,117, with respect to all of its twelve claims which are in suit, is invalid for want of patentable invention. Claim 9 is also invalid because of improper disclaimer. None of these claims is infringed· by the defendants.

3. The "speaker" patent to Lowell and Dunmore, No. 1,606,212, is valid with respect to all of the nine claims in suit. All of these claims are infringed.