## RADIO CORPORATION OF AMERICA v. DUBILIER CONDENSER CORPORATION et al.

### No. 4280.

Circuit Court of Appeals, Third Circuit.
March 18, 1932.

Rehearing Denied July 6, 1932.

See, also, 59 F.(2d) 309.

Charles Neave and Maxwell Barus, both of New York City, Paxton Deeter, of Philadelphia, Pa., and Abel E. Blackmar, Jr., of New York City (William G. Mahaffy, of Wilmington, Del., of counsel), for appellant.

Clifton V. Edwards, Frank A. Bower, and Henry T. Kilburn, all of New York City, for appellees.

Charles B. Rugg, Asst. Atty. Gen., and Alexander Holtzoff, Sp. Asst. to Atty. Gen., amici curiae.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

WOOLLEY, Circuit Judge.

This appeal is from a decree of the District Court holding claims 3 and 14 of Lowell and Dunmore Patent No. 1,455,141 valid and infringed by the defendant's apparatus of the types known as Radiola 17 and Radiola 18. 34 F.(2d) 450. The patent, entitled "Radio Receiving Apparatus," discloses and claims means for the use of alternating current from the standard residence lighting power in lieu of direct current from batteries in radio receiving sets of the three-section type consisting of radio frequency amplifiers, a detector and audio frequency amplifiers. The invention is directed particularly to the elimination of hum occurring in the vacuum tubes when they are heated by unrectified alternating current.

In order to view this invention in its proper setting it will be necessary briefly to advert to the art as it stood in March, 1922, when the application was filed.

Wireless transmission of sound through ether effected by electrically created waves had long been known and practiced. Though in itself a great invention, the first real impulses toward its amazing development and general public use were given by the Fleming valve and the DeForest tube, the latter patented in 1908. Even with these capital inventions the development of radio lagged until about 1912 or 1913 when it became rather actively employed sometimes by telegraph and telephone companies but particularly by governments in the transaction of their business. It was also used by amateurs, chiefly youths, who, rigging up receiving sets according to their own notions, delighted in reaching through the air for distant messages and in delving into the mysteries of the young art. More important however, inventors rushed into this new field and crowded it with almost innumerable inventions, some of which were good and most of which were of no account. Still, radio as a practical instrumentality was for years restricted to professional and amateur uses. It was not until March 4, 1921, when the Westinghouse Company broadcast the inaugural ceremonies at Washington, that the first general broadcast by radio, to be picked up by any one playing with the art, was made, and it was not until fall of the same year that the first broadcasting station —KDKA—affording entertainment was established by the Westinghouse Company at Pittsburgh. Other broadcasting stations quickly followed. Immediately there arose a public demand for receiving sets, and immediately commercial sets were placed on the market by zealous manufacturers. Of various types of sets the one most favorably received, patterned after sets already in specialized uses, was the three-section type consisting of vacuum tubes and appropriate electric circuits of which we shall presently speak at greater length. These circuits were supplied with electrical energy by direct current from storage and dry cell batteries which became known according to their uses as "A," "B" and "C" batteries. When in constant home use, they soon became exhausted and had to be replaced. That involved expense.

Lowell and Dunmore thought this expense could be reduced substantially by using common house-lighting current. It was cheaper than current from batteries, but to employ it as a source of electrical energy they were confronted by two obstinate facts: One, house current is alternating current of about 110 volts and has a frequency of about

60 cycles a second; the other, these rapid and continued reversals of direction produce in a sound output receiving set a distortion of the modulation and a strong hum that make the reception unsatisfactory. Believing they had overcome these difficulties, Lowell and Dunmore invented the apparatus of the patent in suit, operated by home-alternating current instead of by direct battery current, and disclosed its elements and their functions ·by many claims. Claim 3 is typical. This claim, with elements which we have identified by letters for further consideration, reads as follows:

"In an apparatus for the reception of radio signals the combination (a) of a source of signal energy, (b) means for amplifying said signal energy at radio frequencies, (c) means for rectifying said energy, (d) means for amplifying said energy at audio frequencies, (e) a source of alternating current for supplying power to said amplifying means and (f) separate means connected to each of said amplifying and rectifying means for eliminating the hum of said alternating current in said apparatus."

Though the claim is for a combination, it will be necessary to look at each of the several means or elements of the invention, reference being made to the exhaustive opinion of the learned trial judge for a better understanding of their characteristics.

(a) "A source of signal energy." This is the electrically created waves sent through the ether by appropriate apparatus at a broadcasting station.

(b) "Means for amplifying said signal energy at radio frequencies." The waves that are picked up by the aerial are feeble and are of. such high frequencies that they are inaudible. Their strength is raised and their frequencies lowered as the waves pass through a three-section receiver on to the loud speaker. The first section, being the "means" under consideration, contains one or more vacuum tubes ordinarily of the three electrode type. The tubes in this section amplify or raise the strength of the waves. That being their function, they became known as. radio frequency amplifiers.

Still the waves, though stronger, are of such high frequencies—radio frequencies— that they are incapable of producing sound audible, to the human ear. To make the waves with their hidden message audible and therefore useful, the second section comes into play. This is:

·(c) "Means for rectifying said energy," and is a device, either a crystal or a tube, known as a "detector," which rectifies inaudible waves of radio frequencies and converts them into waves of such low frequencies that they come within the range of frequencies which are audible to the ear. They are then known as waves of audio frequencies. Though now audible, they are still rather feeble or not as pronounced as desired in a head telephone or loud speaker. Therefore the inventors provided

(d) "Means for amplifying said energy at audio frequencies." Here the third section of the receiving set, consisting of one or more vacuum tubes, performs the final function, which is to amplify the waves, now of audio frequencies, to the desired volume, whence they pass to the loud speaker. These are called audio frequency amplifiers.

All this requires electricity which the inventors term (e) "a source of alternating current for supplying power to said amplifying means." This is the house-lighting current.

And, finally, the inventors provided

(f) "Separate means connected to each of said amplifying and rectifying means for eliminating the hum of said alternating current in said apparatus." \

These means separately connected with each of the three sections of the receiving set—the radio frequency amplifiers, the detector, and the audio frequency amplifiers —constitute what we shall hereafter call the hum eliminating means or hum eliminators. They require an explanation, avoiding the technicalities of the specification as far as possible.

The three electrodes of a vacuum tube are the filament, grid and plate. Each has its own circuit. All are energized in one way or another by electric current. When direct current from batteries is used, there is of course no reversal of current and in consequence no hum created in the tube. Naturally, therefore, Lowell and Dunmore wanted direct current or its equivalent, particularly in the plate circuits, and yet get it from alternating current. Obviously, alternating current had to be rectified, filtered or transformed into direct current, or the pulsations of the rapid reversals of alternating current, felt in the tube, had to be toned down.

Always, to make a vacuum tube function, it must be heated. This is achieved primarily by heating the filament. The grid and plate are then connected to one side of the filament circuit. All circuits being direct when the energy is supplied by bat-

teries, the thing works and of course it works without a hum. If alternating current were substituted for battery current without changing the connections, the normal potentials of the grid and plate would be made more positive or more negative with respect to the other side of the filament by each alternation of the current, causing hum. To obviate this, Lowell and Dunmore first applied alternating current to the filament. (This had been done before.) Instead of connecting the plate and grid circuits to one side of the filament circuit as is done where direct current from batteries is used, they connected the plate circuit to one leg of the filament heating circuit, and the grid circuit, through a grid biasing means, to a slider of a resistance or potentiometer bridged across the filament circuit. These grid connections are made to the filament circuit not at points of maximum potential variation but at points having the average potential of the whole filament. Then, we understand, they adjusted the slider until the hum introduced by one connection just counteracts or balances out the hum introduced by the other. This "means" is the hum eliminator. It will work on any three-electrode tube or set of tubes requiring the same voltage in any of the three sections of the kind of receiving set we are talking about.

Finally, Lowell and Dunmore, as another phase of the last element (f) in their combination, connected a separate hum eliminating means to each amplifying and rectifying means, that is, to the radio frequency amplifier section, the detector section and the audio frequency amplifier section.

This is a highly scientific organization, and this is what Lowell and Dunmore say they invented. Looking at it as they disclose it, that is, looking at it close up without looking at its background, it would appeal to any one as invention. If they had invented this apparatus and all its elements, their invention unquestionably would have been basic; it would have been more than that; it would have been stupendous, for it would have covered the major portion of the practical radio art as it stands today. But they did not invent all of these elements; indeed, they frankly admit they did not. What then is the invention?

Not forgetting that the claim in question is for a combination, we must nevertheless dissect it and pick out and set aside all that is old in order to see what is left and discover what is new, and, accordingly, determine whether the new with the old constitutes invention. Without repeating what we have already said as to the character and function of the several "means" which we have described in alphabetical order, it will be enough to say that means lettered a, b, c, d and e are unquestionably old. Lowell and Dunmore did not invent or improve them; they simply used them as they found them. Thus in one swift movement nearly all the apparatus must be set aside. Also, the hum eliminating means employed by Lowell and Dunmore in the last element of the claim (lettered f) is admittedly old. They simply used it as Heising had taught them by his patent in 1916 (No. 1,432,022) in the light of the White patent of the same year (No. 1,195,632). The only thing left and therefore the only thing new is merely a part of element f. It is the separate connection (new) of an old hum eliminator with old tubes in each section of an old receiving set of the three-section type.

There is a question, serious enough to justify the contest that arose from it, whether the patentees really contemplated hum elimination in a receiving set in which all the amplifying and detecting means are vacuum tubes, which now everybody uses. In their experiments, as shown by their notes, they discarded vacuum tubes for detectors, stating they developed objectionable hum, and resorted to a crystal detector and condenser which worked without applying alternating current to the detector circuit. Though employing a crystal detector, the patentees, we shall assume with some hesitation, saved the claim and included tube detectors by saying, "although other forms of rectifier may be readily employed." Anyhow, if not restricted by the specification, the claim, referring to the elimination of hum in the "rectifying means," is broad enough to cover detectors of the latter class.

The invention of "separate" connection of hum eliminators, if invention it be, is influenced or is still further reduced in value by the fact that hum eliminators of the kind the patentees employed had long before been connected with the radio frequency amplifier section in the use of alternating current. Therefore, in the final analysis, the claimed invention consists in applying curbed alternating current to the detector section and the audio frequency amplifier section and also to the radio frequency amplifier section in the same way that it had previously been applied to the last named section. Is this invention?

It might be invention if, when operating, some hum should develop in the first section and pass over to the second section,

or if hum in these two sections should invade the third section and be suppressed before it reaches the loud speaker by the three hum eliminators coacting to that end. In other words, there might be invention if the hum eliminators, though separately placed, functioned together on the circuits of all sections in eliminating wandering hum. There is, however, no suggestion of such hum action, and no such interrelation or coaction of separately placed hum eliminating means is claimed for the invention. Instead of doing anything like this, the plaintiffs themselves claim that the hum is killed "at the source"—at the mid-point connection—that each eliminator stops hum in the tubes of its own section, or, rather, as we look at it, each eliminator prevents hum from developing in the tubes with which it alone is connected, leaving nothing for the other eliminators connected with the other sections to do with the tubes of its section or with hum in them. So it appears that each eliminator performs in the apparatus of the combination claim the same function it performed in the device from which it was taken, Motion Pictures Patents Co. v. Calehuff (C. C. A.) 251 F. 598, 602; that is, each does its own work in its own section and is through. The result, in theory at least, is complete hum prevention or elimination in each section by each eliminator. It follows that the effect of the operation of all the eliminators is an aggregation of separate results, Powers-Kennedy Corp. v. Concrete Co., 282 U. S. 175, 186, 51 S. Ct. 95, 75 L. Ed. 278, all alike and all admittedly obtained by prior art means. From the very nature of the circuit connections, the three eliminators act independently of one another, Hailes v. Van Wormer, 22 Wall. (89 U. S.) 353, 22 L. Ed. 241. Operating separately yet in conjunction with other elements of the combination, they evolve no new co-operative function, Grinnell Washing Machine Co. v. Johnson Co., 247 U. S. 426, 433, 38 S. Ct. 547, 62 L. Ed. 1196; Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U. S. 492, 498, 19 S. Ct. 641, 43 L. Ed. 1058, and the new result, as claimed, is only that which arises from the well-known operation of each one of the several elements of the combination, Grinnell Washing Machine Co. v. Johnson Co., supra.

Having before them White and Heising, who told them how to prevent hum in vacuum tubes energized by alternating current wherever positioned in the receiving set, we cannot believe it was invention for Lowell and Dunmore to connect a hum eliminator with the audio frequency amplifier tubes even if they were first to do so, or invention to connect them separately with the radio frequency amplifier tubes (as before), with the detector tubes and the audio frequency amplifier tubes.

Moreover, while the radio art had passed from its infancy in 1922 when the application was filed, it had not attained its full stature. Radio broadcasting for entertainment purposes and the business of supplying receiving sets to the public had just started. Commercial radio receiving sets were just coming on the market. They came in different forms with different electrical organizations, and they came so rapidly that, seemingly, a set one day would be obsolete the next day. All used batteries as the source of electrical energy, and in the rapid transition in apparatus then occurring there was no demand for alternating current as an electrical source. Therefore, the Lowell and Dunmore alleged invention did not meet a want in the art. Nor did it in fact emerge in the practical art until four or five years later when the vacuum tube, as then improved and now existing, could be commercially made in a form that would make alternating current as the source of electrical energy and the use of hum eliminators a practical consideration. And even then hum eliminators were not always separately applied and restricted to tubes in their own respective sections but, as in the alleged infringing sets, they were extended to tubes requiring the same voltage to heat them, without regard to the section in which they happened to be placed. In other words, the art employing alternating current—certainly that part which is represented by the defendant—provided hum eliminating means in accordance with the teaching of White and Heising, not for each section of a receiving set but for tubes (in whatever section) according to the different voltage they required to perform their different tasks.

Being of opinion that in developing the apparatus of the patent in suit the patentees applied in a natural and ordinary way the prior knowledge of the art without making an inventive advance, we are constrained to hold claims 3 and 14 of the patent invalid.

The decree of the District Court is reversed with direction that the bill be dismissed.