BERGHANE
v.
RADIO CORP. OF AMERICA.
Civ. A. No. 260.

United States District Court
D. Delaware.
Oct. 22, 1953.

William H. Parmelee, of Christy, Parmelee & Strickland, Pittsburgh, Pa., and

Howard Duane, Wilmington, Del., for plaintiff.

Stephen H. Philbin, of Fish, Richardson & Neave, New York City, and E. Ennalls Berl, of Berl, Potter & Anderson, Wilmington, Del., for defendant.

LEAHY, Chief Judge.

1. This is a patent suit. The complaint was filed in July, 1942, upon twelve McCullough patents, and was tried in January, 1949. The trial concluded on January 19, 1949; it was then agreed plaintiff would file a brief with proposed findings of fact and conclusions of law, which would thereafter be answered by defendant.

Plaintiff in August, 1952, filed a brief; and, about a year later, in July, 1953, plaintiff filed proposed findings of fact and conclusions of law. Defendant filed its proposed findings and brief on September 8, 1953.

During trial, plaintiff agreed to dismissal of four patents, viz., 1,549,591, 1,615,022, 1,759,910 and 1,791,140; the court reserved decision as to whether they should be dismissed with or without prejudice. Plaintiff in its brief (p. 30) consented to dismissal of another patent, 1,937,706.

An order will be entered, dismissing without prejudice these five patents.

This leaves seven patents.

| | |
|---|---|
| 1,615,093 | Charcoal on anode, filed Sept. 17, 1923, issued Jan. 18, 1927. Claim 1; |
| 1,677,900 | Degassing sequence, filed May 6, 1925, issued July 24, 1928. Claims 1, 3; |
| 1,787,082 | Oxide coated cathode "conditioned" by heat radiated from a metal envelope, filed March 29, 1924, issued Dec. 30, 1930. Claim 1; |
| 1,806,109 | Inter-stage oscillations, filed Nov. 2, 1926, issued May 19, 1931. Claim 2; |
| 1,819,783 | Tube electrode connections in combination with tuned circuits, filed May 4, 1925, issued Aug. 18, 1931. Claims 3, 5; |
| 1,991,767 | Ceramic seal in combination with electrode connection, filed Oct. 28, 1931, issued Feb. 19, 1935. Claim 3; |
| 2,093,567 | Bushing in exhaust opening sealed by a gob, filed June 19, 1933, issued Sept. 21, 1937. Claim 5. |

The patents in suit are "paper" patents. There is no evidence any has been used.

The result is two-fold. First, there is the doubt concerning the operativeness of the claimed invention. And, second, the patents cannot be broadly construed for infringement purposes, as this court in Patents, Inc., v. Gillette Safety Razor, D.C.Del., 28 F.Supp. 666, 670, declared the patent "is a paper patent and must be narrowly construed" (affirmed 3 Cir., 115 F.2d 484). Again, this court in Martin v. United Aircraft, D.C. Del., 32 F.Supp. 367, 368, where there was no commercial success of the patents shown, held "Under the above circumstances the claims must be limited to the specific mechanical constructions that the patents actually disclose."

The defenses are each of the claims in suit is invalid, and none is infringed. As my ultimate findings are the patents are invalid, I shall not discuss questions of infringement. See, Stanley Works v. Rockwell Mfg. Co., 3 Cir., 203 F.2d 846.

2. Validity of the claims of the patent in suit must be considered.

3. The Patent Office did not decide any of the McCullough patents contained patentable invention.

At the time the applications for the McCullough patents were in the Patent Office, patents were issued when the Patent Office, even on the record before it, doubted there was patentable invention.[1]

The same Court, In re Wilson, 49 App. D.C. 76, 258 F. 976, at page 977, said: "We are in doubt as to whether or not

---

[1]. For resolution of doubt in such cases, see In re Schraubstadter, 26 App.D.C. 331.

4. Now to examination of validity:

A. Tube "Degassing" Patents 1,677,-900, 1,787,082 and 2,093,567.

■ 1. *Patent 1,677,900. Degassing sequence. Claims 1 and 3.*

This patent describes ways of heating a tube and its parts to degas them during the manufacture of the tube. The envelope of the tube is connected to a pump and the tube is heated during the pumping out, then being sealed off and ready for use. All the heating methods described in the patent are old. They are by baking, high frequency induction, current through the cathode wire, and electron bombardment of the anode.

The alleged invention is a combination of these old ways in an alleged new sequence. It falls short of the standards established by courts for "patentable" invention. It was within the skill of the radio engineer to heat tubes by any one or more of the well-known ways.

a. Patentable invention. Crosley Corp. v. Westinghouse, 3 Cir., 152 F.2d 895, at page 903, said:

" * * * Nothing 'somewhat above ordinary mechanical or engineering skill' was 'distinctly shown.' Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 231, 27 L.Ed. 438. Anderson's 'invention' is 'no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention.' Sinclair & Carroll Co. v. Inter-Chemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 1147 [89 L.Ed. 1644].

"Little more can be said for the other four patents. They were 'but the display of the expected skill of the calling' and involved 'only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice,' and were 'in no sense the creative work of that inventive faculty which it is the purpose of the constitution and the patent laws to encourage and reward.' Hollister v. Benedict & Burnham Manufacturing Co., 113 U.S. 59, 5 S.Ct. 717, 724, 28 L.Ed. 901.

■ "It is true that they represented improvements over the prior art. 'But all improvement is not invention, and entitled to protection as such. Thus to entitle it, it must be the product of some exercise of the inventive faculties, and it must involve something more than what is obvious to persons skilled in the art to which it relates.' Pearce v. Mulford, 102 U.S. 112, 118, 26 L.Ed. 93.

"In Atlantic Works v. Brady, 107 U.S. 192, at page 200, 2 S.Ct. 225, at page 231, 27 L.Ed. 438, the Supreme Court said:

" 'To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences.' "

■ This Circuit again said in Zephyr American Corp. v. Bates Mfg. Co., 3 Cir., 128 F.2d 380, 385:

"Invention does not reside in mere skill" (citing cases).

"An aggregation of elements, old in the art, which does not bring about a new

---

Wilson is entitled to claims 4 and 10, and, this being so, it is our duty to resolve the doubt in favor of the applicant", citing the Schraubstadter and other decisions.

This practice in the Patent Office was observed until 1935, as shown by the decision in that year by the Court of Customs and Patent Appeals, In re Davis, 77 F.2d 640, 643, 22 C.C.P.A., Patents, 1308: "We think that, with respect to said claims 2, 3, 10, 11, 12, and 15 to 17, inclusive, there is at least sufficient doubt upon the question of patentability that, under the rule that such doubt should be resolved in favor of the applicant, said claims should be allowed."

Plaintiff is wrong in saying the Patent Office "recognized the existence of the patentable idea which McCullough disclosed", because the Patent Office granted patents when it was in doubt as to the existence of patentable invention. That question was left by the Patent Office for the courts to decide.

204

and useful result is not invention" (citing cases).

"Even the disclosure by a paper patent furnishes anticipation fatal to patentability. E. J. Brooks Co. v. Klein, 3 Cir., 114 F.2d 955, 957."

Again, in Hazeltine v. General Motors, 3 Cir., 131 F.2d 34, 39:

"But there are numerous situations in which courts confronted with the question whether invention is found by ingenious application of known principles, to a known problem, by the use of devices already known and understood, to produce a predictable result, have held that invention was not involved" (citing cases).

b. There was nothing patentable in McCullough Claims 1 and 3. The McCullough patent says in the degasification of the "cylindrical cathode" type of tube, trouble arises when the tube is heated at the same time by both "plate voltage" (electron bombardment, thermionic bombardment) and induction heating. So the patent proposes to reduce the heating, by using plate voltage only after the induction heating has been used.

The specific trouble, says the patent, when plate voltage and induction heating were simultaneously used, was "arcing between the plate and cathode" resulting in "injury to the cathode". This "arcing" depended upon the physical constructions of the plate and cathode, their distance apart, what was in the space between them and the voltage applied between plate and cathode, and would differ with different types of tubes. Plainly, it would not require a patentable thought, upon observing that a tube "arced" when heated simultaneously by the two different ways of "plate voltage" and induction heating, to stop the simultaneous use.

The art knew the tube and its parts could be heated by various methods—no one could validly patent the use of two or more such methods in combination or in any particular sequence. That was well within the experience of the art.

Conclusion:

Claims 1 and 3 are invalid for want of patentable invention.

c. Decisions on "combination" patents. Authorities on "combination" patents are pertinent, because this patent, like McCullough "circuit" patent 1,819,-783 and McCullough tube "structure" patent 1,991,767, is of that type, where every element in the claim is old, and the alleged invention is to use them together.

Pertinent are decisions in this Circuit and the Fourth Circuit on the Lowell & Dunmore patent 1,455,141, which is in evidence here; Dubilier Condenser Corp. v. R. C. A., D.C.Del., 34 F.2d 450, reversed, 3 Cir., 59 F.2d 305, 309; and Lowell v. Triplett, 4 Cir., 97 F.2d 521. The patent was a combination of old and well-known devices, which never had been before the patentee so combined, and also was very advantageous, being used by defendant and others. Although this court upheld the patent because patentees were the first to apply "raw" (unfiltered) alternating current to the filaments (cathodes) of audio frequency amplifier tubes and the first to suggest hum eliminating means should be installed in the several parts of a receiver, this was reversed by the Court of Appeals, saying, Radio Corp. v. Dubilier, 3 Cir., 59 F.2d 305:

"Not forgetting that the claim in question is for a combination, we must nevertheless dissect it and pick out and set aside all that is old in order to see what is left and discover what is new, and, accordingly, determine whether the new with the old constitutes invention." 59 F.2d at page 307.

"So it appears that each eliminator performs in the apparatus of the combination claim the same function it performed in the device from which it was taken, Motion pictures Patents Co. v. Calehuff, 3 Cir., 251 F. 598, 602; that is, each does its own work in its own section and is through. * * * It follows that the effect of the operation of all the eliminators is an aggregation of separate results, Powers-Kennedy [Contracting] Corp v. Concrete Co., 282 U.S.

175, 186, 51 S.Ct. 95, 75 L.Ed. 278, all alike and all admittedly obtained by prior art means. From the very nature of the circuit connections, the three eliminators act independently of one another, Hailes v. Van Wormer, 20 Wall. [353], 89 U.S. 353, 22 L.Ed. 241. Operating separately yet in conjunction with other elements of the combination, they evolve no new co-operative function, Grinnell Washing Machine Co. v. Johnson Co., 247 U.S. 426, 433, 38 S.Ct. 547, 62 L.Ed. 1196; Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U.S. 492, 498, 19 S.Ct. 641, 43 L.Ed. 1058, and the new result, as claimed, is only that which arises from the well-known operation of each one of the several elements of the combination, Grinnell Washing Machine Co. v. Johnson Co., supra.

"Having before them White and Heising, who told them how to prevent hum in vacuum tubes energized by alternating current wherever positioned in the receiving set, we cannot believe it was invention for Lowell and Dunmore to connect a hum eliminator with the audio frequency amplifier tubes even if they were first to do so, or invention to connect them separately with the radio frequency amplifier tubes (as before), with the detector tubes and the audio frequency amplifier tubes." 59 F.2d at page 308.

■■ So, too, in Huntman Stabilizer v. General Motors, 3 Cir., 144 F.2d 963, 965:

"The general propositions of law applicable to combination patents are not difficult either to state or to understand. A combination is a union of elements, some of which may be old and others new or all old or all new. It is the combination which is the invention. Leeds & Catlin Co. v. Victor Talking Machine Co., 1909, 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805. But the result must be the combination and not a mere aggregation of several results, each the complete product of one of the combined elements. It must be the product of the coacting influences of the various elements and which is produced by their union. Hartman Fur-

niture & Carpet Co. v. Banning, 7 Cir., 1932, 59 F.2d 129, certiorari denied, 1932, 287 U.S. 659, 53 S.Ct. 121, 77 L.Ed. 560. A number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them is not patentable invention", citing authorities.

In Pennsylvania Crusher Co. v. Bethlehem Steel Co., 3 Cir., 193 F.2d 445, 450, this Circuit wrote:

"Even if we were to accept the thesis urged upon us by Pennsylvania that the Battey machine is a new combination of old elements, we do not think it can withstand the strict test set forth by the Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. That decision directs us to 'scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.' "

Claims 1 and 3 are invalid, because lacking in patentable invention, and because each is only "an assembly of old elements".

■ 2. *Patent 1,787,082. Oxide coated cathode "conditioned" by heat radiated from a metal envelope. Claim 1.*

This patent is based on McCullough's observation when the metal envelope of a large power tube used in transmitting stations was heated enough to degas it, the cathode inside the envelope was heated by radiation enough to "condition" the cathode, i. e., to break down chemical compounds into an oxide coating for the cathode.

It was known before McCullough heating a cathode would "condition" it. The practice was to use the simple method of passing an electric current through the cathode wire, just as done when the tube was operated, as shown in the prior Sutherlin patent 1,740,481.

Heating by radiation was another way of heating the cathode, which did not rise to "patentable invention". Therefore, claim 1 of the patent is invalid.

In addition, Stoekle patent 1,353,976, anticipates the McCullough observation. Stoekle patent describes the same type of tube as the McCullough patent, namely, a large tube with metal envelope acting as an anode, and an oxide coated cathode which required conditioning by heating.

Both Stoekle and McCullough heat the metal envelope, McCullough by baking in an oven and induction heating, and Stoekle by "any suitable manner such as playing a Bunsen flame over the tube or by using an electric furnace".

Naturally, temperature to which the envelope is heated determines whether the heat radiated by the envelope is enough to "condition" the cathode. Both Stoekle and McCullough teach the same, each saying the envelope temperature should be higher than the temperature under operating conditions.

Claim 1 is invalid for lack of patentable invention, and because of the Stoekle patent.

■ 3. *Patent 2,093,567. Bushing in exhaust opening sealed by a gob. Claim 5.*

This patent describes a bushing in an exhaust opening in the top of a radio tube, and the melting of a glass gob to fill the opening after the tube has been exhausted of gases.

The patent claims it "is for an improvement on the invention disclosed in my co-pending application Serial No. 575,178 filed October 28, 1931, now Patent Number 1,991,767, February 19, 1935."

The "improvement" is melting a glass gob, instead of melting a glass tubulation, to close the exhaust opening after pumping. Patent No. 1,991,767, which is in suit, Fig. 1, has "a glass tube 5", or "glass tubulation 5", and "When the pumping of the tube has been effected, the sealing off can be accomplished in the usual manner by softening the walls of the glass tube 5 at 17 to cause the walls to collapse and close the tube".

The McCullough patent now under consideration, 2,093,567, says in its tube:

"the usual tubulation for exhausting the tube is not required".

"without the usual glass tubulation".

"there being no thin glass in the construction either in the form of a tubulation or in the form of an envelope".

As pointed out by Dr. Shackelford, claim 5 in suit describes the earlier McCullough patent 1,991,767, except for the idea of melting a glass gob instead of a glass tubulation to fill an opening.

Palpably the patent is invalid, because there is no patentable invention required to use glass of any desired shape, for sealing an opening by melting. Otherwise, every possible shape of glass could be patented.

Sealing by melting a gob was old. Valverde patent 1,911,410 uses a gob to seal openings in "glass tubes or bulbs of various kinds, such as electric light bulbs, or radio tubes, though not so limited". A "small hard pellet 5 of heat plastic cement is dropped into the tube", and is then "melted by the flame 10 and runs into the capillary to seal it as before described". Enough to invalidate this McCullough patent.

Claim 5 is invalid, for lack of patentable invention, because there is nothing inventive in melting a glass gob instead of a glass tube—both doing the same thing in the same way.

5. As to structure patents:

B. Tube "Structure" Patents 1,615,093 and 1,991,767.

■ 1. *Patent 1,615,093. Charcoal on anode. Claim 1.*

The only claim in suit of this patent is also invalid.

Claim 1 is:

"1. A vacuum tube having an anode and a cathode and a coating of charcoal on the entire part of that surface of the anode directed away from the cathode."

a. Claim 1 is broader than the disclosure of the patent. The use for charcoal as a coating for a tube anode disclosed by the patent is for absorbing

gas. Such use is claimed in each of the other five claims, but not in claim 1, which is for charcoal on an anode, regardless of what use, if any, the charcoal would be. The claim is broader than the disclosure. Therefore, it is invalid. See, General Electric Co. v. Wabash, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402. The claims in suit were invalidated, the Court saying, 304 U.S. at page 374, 58 S.Ct. at page 904:

"Finally, the product claims may not be saved by a limitation to products produced in accordance with the process set out in the specification. * * * The claims in suit seek to monopolize the product however created, and may not be reworded, in an effort to establish their validity, to cover only the products of the process described in the specification, or its equivalent".

So, too, Graver Tank & Mfg. Co. v. Linde, 336 U.S. 271, 277, 69 S.Ct. 535, 538, 93 L.Ed. 672:

"The statute makes provision for specification separately from the claims and requires that the latter 'shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery.' R.S. § 4888, as amended 35 U.S.C. § 33 [now 35 U.S.C.A. §§ 111, 112, 162]."

"We have frequently held that it is the claim which measures the grant to the patentee", citing cases.

"While the cases more often have dealt with efforts to resort to specifications to expand claims, it is clear that the latter fail equally to perform their function as a measure of the grant when they overclaim the invention."

b. The patent, including Claim 1, is invalid, because it is inoperative. The title of the patent is "High Vacuum Space Discharge Device and Gas Accumulator Therefor". The "gas accumulator" is placed on one side of the anode, to absorb gas emitted during the operation of the tube. But the only materials disclosed in the patent are "oxides of various kinds", specifically a metallic oxide, "oxide of aluminum", and "willow charcoal". Neither will work as gas absorber, or "getter", when placed on the anode of a tube.

6. As to metallic oxides:

Mr. Batchelor, plaintiff's witness, testified as follows:

"Then later on he [McCullough patent] specifies 'As an example, an oxide of aluminum might be used'.

"Do you know what oxides are good gas accumulators when used in radio tubes of the kind we have been talking about? A. I have never used metallic oxides as getters in vacuum tubes, and I have no personal knowledge of their characteristics." (P. 249.)

"Q. Then you have no knowledge of your own experience whether or not any metallic oxide is useful as a gas accumulator in a radio tube? A. I know of my own knowledge that many oxides are not useful as a getter.

"Q. Do you know of any oxide that is useful as a getter? A. Not at the moment, sir." (R. 250.)

And Mr. Batchelor, again:

"Have you had any experience with the use of metallic oxides in vacuum vessels? A. I have had some experience in that, yes.

"Q. To what extent? A. I have used copper oxide in vacuum devices or low pressure devices for the purpose of maintaining the gas contents so as to avoid the cleaning of the gas in such devices.

"Q. In other words, copper oxide was used to prevent absorption of gas? A. Yes. Specifically it was used to stabilize the pressure of water vapor in tubes which required small amounts of water to be present."

Thus, according to the evidence in the record concerning whether oxides will absorb gas or will prevent the absorption of gas, plaintiff's witness was positive oxides would not act as gas absorbers ("getters"), although the McCullough patent states they will.

7. As to willow charcoal:

The only other material which the patent says will absorb gas when on a radio tube's anode is willow charcoal, but it will not.

8. The main authorities on inoperative patents are: Smith v. Nichols, 21 Wall. 112, 118, 88 U.S. 112, 22 L.Ed. 566, Schmidt v. Central Foundry Co., 3 Cir., 229 F. 157.

c. Claim 1 is invalid, for lack of invention. Claim 1 is bad because it is too broad, being not limited as are the other claims to charcoal as a gas absorber. Even if the claims should be construed to mean the same as the other claims, it would be invalid, because it did not involve invention to use charcoal, instead of other materials, to absorb gases in vacuum tubes.

It was known radio tubes during operation became heated and released undesirable gases, which should be absorbed by "getter" materials, as in the Sutherlin patent 1,740,481 ("absorption of the gases by the finely divided porous material of the getter"). It was known charcoal would absorb gases at least under certain conditions, Encyclopedia Britannica articles and Claude patent 1,189,664. To propose the use of charcoal, a well-known material for absorbing gases in lieu of other well-known materials, was not patentable invention.

d. Claim 1 is invalid because for a matter of degree. Claim 1 was allowed by the Patent Office upon the difference in degree between coating a part of an anode face, and the entire face. In the Patent Office, the McCullough application had a rugged road. All the original 11 claims were rejected because of lack of invention; amended; again rejected; and then various claims were either cancelled or amended, and patent claim 1 added. This claim was then rejected because—

"failing to patentably differ from Holst et al. who shows a vacuum tube having an anode a and a cathode and a coating on that surface of the anode directed away from the cathode."

The claim 1 was then amended by adding "the entire part of" to distinguish from Holst, 1,485,505, who, it was said, "discloses a method of applying alloy to a small area of the outside of the cylindrical anode". The claim was then allowed, on the difference in degree of coating all, instead of a part, of an anode side. Both plaintiff's and defendant's witnesses agreed that this was only a difference in degree.

For example, Mr. Batchelor testified on cross-examination:

"Q. The greater area that is covered the more gas absorption? In other words, you get less gas absorption the smaller part of the surface is covered? A. The greater the exposed area of the material the greater gas absorption propensities, other things being equal.

"Q. Is that a matter of degree? A. The area situation?

"Q. Yes. A. There must be enough in relation to the volume of the tube to afford adequate collecting properties for that entire volume which will be filled with the unwanted gas."

Dr. Shackelford also testified, referring to claim 1 and its charcoal:

"As to whether it is on the entire surface or part of the surface, in both cases the outer surface, it is, I would say, a matter of degree".

Claim 1 was obtained on a difference of degree; differences of degree are not patentable.

9. Authorities have spoken on differences in degree:

Bituminous Products v. Headley Good Roads, 3 Cir., 14 F.2d 667, 668. Trial court invalidated claims, concluding "the difference so far as the bitumious base is concerned is one of degree only, and not of kind, there being no sharp distinction of any kind whatever expressed in this range." The Court of Appeals, agreeing, said: "We think his conclusion is right, and the decree is affirmed on his opinion."

In General Electric Co. v. Amperex Electronic Products, 2 Cir., 89 F.2d 709,

710, the Meikle patent in suit was invalidated because of the earlier Friederich patent.

"The expert said that the only difference is that Meikle uses a larger anode than did Friederich. That presents the question of whether it amounts to an invention over Friederich to do so. Merely increasing the size of the anode does not."

In Johnston & Jennings v. Neville, 3 Cir., 108 F.2d 180, a tube-bank was made shorter; it was held this change in size did not amount to invention, quoting Railroad Supply Co. v. Elyria Iron & Steel Co., 244 U.S. 285, 37 S. Ct. 502, 61 L.Ed. 1136, "that where the alleged invention rests in the mere carrying forward of the original idea, and where the change is only in form or of proportions, or of degree, there is no such invention as will sustain a patent."

This Court was affirmed in Floridin Co. v. Attapulgus Clay, 3 Cir., 125 F.2d 669, 670, the Court of Appeals saying the patent "involves no more than a variation in degree normally determined by the skill of one versed in the art and is not a matter of invention."

2. *Patent 1,991,767. Ceramic seal in combination with electrode connection. Claim 3.*

This patent describes two forms of tubes having the alleged invention of the patent (shown in Figs. 1 and 2). Each form has two ceramic discs to support the electrodes and their leads, and a ceramic sealing material to seal the discs to the metal walls of the tube envelope, and also to seal around the leads through the envelope.

Fig. 2 is the basis for claim 3 in suit. The patent says:

"In the arrangement shown in Figure 2 the construction is generally similar to that described, but the envelope of the tube, instead of constituting the anode for the tube, preferably comprises a shield".

The only difference in the "construction' is the immaterial difference the electrodes inside the tube in Fig. 1 are a cathode with heater and a control grid; and in Fig. 2, a cathode with heater, a control grid, a screen grid, and an anode. In each case, there is a metal envelope, which in Fig. 1 is connected as an anode, and in Fig. 2 as a shield.

In each case the ceramic discs inside the envelope support electrodes, and the ceramic sealing material seals the discs to the metal walls and also seals the leads. Only difference is the way the metal envelope is connected in an electric circuit.

Claim 3 is invalid, for want of patentable invention. It reads:

"3. A thermionic tube comprising a metal external envelope, a ceramic supporting body at each end of the envelope."

That is the ordinary metal tube, with a ceramic support at the top and another at the bottom, to support the electrodes, as disclosed in the earlier Houskeeper patent 1,583,363, whose "lavite" discs 9 and 17 support the electrodes, "lavite" being a ceramic. The Stoekle patent 1,353,976 has its supporting discs 107 and 108 (Fig. 4, p. 3, ll. 41–44) of glass which is also a ceramic.

There is nothing new in sealing material. Thus, Gray patent 1,269,534 shows a hollow metal tube with a metallic electrode inside it connected to a metal rod extending outside the tube, like the metal electrodes (grid, anode) in a radio tube and their metal leads outside the tube. The electrode and its lead are bonded to the metal walls of the tube by "a seal which is of a character to make a good bond between the metallics surfaces of the tube 1 and the rod 3", and porcelain plugs 6 and 7 also separate the rod from the walls. Although the Gray device is a lightning arrester, it has "a vacuum" and "attenuated atmosphere", and the problem of sealing or bonding a metal rod to a metal wall is the same, regardless of the degree of vacuum.

Continuing with claim 3:

"a fused ceramic sealing material forming a seal between said metal

body and said supporting members at each end of the tube".

Houskeeper does not have a sealing material, being like the RCA tubes in relying upon the tightness of fit. But Stoekle, although not showing a seal for his electrode supports, says with respect to the fit between other glass members and the metal body that "it is in general desirable to further improve the seal by means of suitable sealing compounds". This teaches that glass to metal attachment could be improved by "suitable sealing compounds".

Claim 3 thus continues:

"anode, cathode and grid electrodes within the shell carried by the ceramic supporting members,"

Houskeeper and Stoekle attached two electrodes, cathode and grid, to their supports, and used the metal shell as the anode. Fig. 1 of McCullough does the same. However, Fig. 2 and claim 3 add an anode electrode to the other electrodes inside the shell. But, addition of another electrode to be supported, in exactly the same way, is obvious.

Claim 3 then concludes:

"said metal envelope constituting an electrode other than an anode."

The metal envelope is the same in Figs. 1 and 2 of the McCullough patent. The envelope, in the McCullough patent, is "generally connected to ground, by a connection to the cathode lead wire, which wire is grounded". McCullough calls the metal envelope an "electrode". In the usual definition of an electrode, when grounded, it is plain what he means is a metal envelope which has a ground connection.

Simonds patent 1,740,375 discloses in Fig. 1 "a tubular evacuated receptacle 1 in which are enclosed an electron emitting cathode 2, and anode 3, a control grid 4, and a screening grid 5". At the bottom of Fig. 1 is the tube socket 23 upon a metallic plate 25, and there is a cylindrical member joined to plate 25, and the socket may be mounted "upon a metal panel 26. If the shielding structure is connected to ground then an effective shield is provided". It is clear from other references grounding was old.

There is nothing new in the McCullough patent. Claim 1 is invalid because its subject matter did not require patentable invention.

Claim 3 is invalid because it is not for a true "combination". Claim 3 consists of an electrode assembly inside a metal envelope, and an electric connection to the metal envelope which is grounded. The claim is obviously for "an aggregation of separate results," Radio Corp. of America v. Dubilier, 3 Cir., 59 F.2d 305, 308; therefore invalid. The ceramic discs and the sealing material inside the tube are the same; function the same, whether or not the envelope is connected to act as an anode or as a grounded shield.

■ A combination patent for an aggregation of separate elements is invalid.

In Reckendorfer v. Faber, 92 U.S. 347, at page 356, 23 L.Ed. 719, it was said "Mechanical skill is one thing: invention is a different thing", and repeated, in 92 U.S. at page 357:

"The combination, to be patentable, must produce a different force or effect, or result in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union: if not so, it is only an aggregation of separate elements."

I said, in Gillen v. Reynolds Metals, D.C.Del., 49 F.Supp. 1006, considering a combination claim, finding it invalid for want of invention (p. 1008):

"Hence, the combination claimed, as I read the patent, is palpably invalid in that there can be no invention in combining a secondary hood or pouring lip closure with an ordinary milk bottle."

10. As to circuit patents:

C. Circuit Patents 1,806,109 and 1,-819,783.

■ 1. *Patent 1,806,109. Interstage oscillations. Claim 2.*

This patent describes a tuned radio frequency amplifier, having three stages of tuned radio frequency amplification.

No means for controlling regeneration are disclosed in the patent except "neutralization", which the patent says is unsatisfactory and is not used, and the decrease of amplification in successive stages by decreasing the grid-plate capacity coupling in successive stages, leaving the first tube with the usual such coupling.

This patent is invalid, because inoperative. There are reasons why the multistage tuned radio frequency amplifier of the patent is inoperative. For example, the patent is concerned with only "interstage" oscillation in the second and third stages, and no control is provided for oscillations produced by feed-back from the output circuit of the first tube stage to its input circuit. In the first tube alone, there would be regenerative oscillations which would make the system inoperative for reception. The testimony of Carlson the McCullough system would have harmful oscillations was uncontradicted. The nearest Mr. Batchelor, plaintiff's witness, could come to saying the first tube would not oscillate was that it "with a very weak input signal will not really break into oscillation".

■ 2. *Patent 1,819,783. Tube electrode connections and tuned circuits. Claims 3 and 5.*

This patent describes a way in which a receiver using filamentary cathode type tubes can be changed for use with "heater" tubes having "heater" connections on top of the tube.

The receiver is a "standard" tuned radio frequency amplifier, having two radio frequency amplifier tubes, a detector tube, and two audio frequency amplifier tubes. There is a "tuned circuit" (coil and variable condenser) in the input (grid) circuit of the first three tubes.

The cathode wires were supplied with heating current, by common conductors A and $A^1$, there being in the "standard receiver" an A battery between the conductors at the same place as where the "C" battery is in Fig. 1.

All grids were supplied with a negative biasing voltage, by the same A battery and conductor A.

Cathode conductor $A^1$ was grounded, by connection to the grounded antenna on the right.

All the anodes were supplied with plate (anode) voltage by the unmarked battery at the lower right of Fig. 1.

This McCullough patent proposes only one change in the circuits, to enable the use of the McCullough "heater" tubes. One filament terminal $A^x$, is removed in each tube.

The set operator connects to the set a "C" battery at the place where the A battery was connected, which, like the A battery, also supplied negative bias voltages to the grids, by the same conductor A. Because of the removal of the filament terminal, the full voltage of the "C" battery would be applied to the grids instead of the one-half voltage of the A battery as previously connected.

The "C" battery in the set made the grids negative with respect to the cathodes.

Claim 3 (and 5) is invalid, for want of invention. For example: Claims 3 and 5 are the same except claim 3 calls for a "source of direct current" and claim 5 for "a battery". With respect to validity, there is no difference between the claims, and only claim 3 should be considered.

Claim 3 is a combination of common tube features and common "means for tuning the circuits". There is no relation between these two things.

There is nothing new in claim 3. Claim 3 commences:

"3. The combination with a radio circuit for thermionic tubes, of tubes in the circuit having cathodes, looped means energized by an alternating current for heating the cathodes, an alternating current multiply connected with the said heating means."

This simply says there are several AC tubes operated by the same heating

current source, which is true of the tubes in the 1922 Freeman article ₁(Electric Journal) and the 1924 filed Anderson patent 2,086.595 (Carlson, R. 710–13; 740–44, 767).

"one side of said alternating current circuit being grounded to one side of the radio circuit".

In the radio art, it has been common practice to "ground" various circuits. Usually, a wire is connected from the circuit to the ground, and as the earth is at zero potential (voltage), the wire and everything conductively connected to it is at zero potential. Thus, in 1910, Fleming patent 954,619, the antenna is grounded. So in the "standard" set of the McCullough patent, all the cathodes were grounded, by connection of the cathode conductor wire $A^1$ to the grounded antenna.

Likewise, the "heater" wire in a sleeve or heater type of tube was grounded. The 1922 AC tube of the Freeman patent 1,794,950 grounds both the cathode and its heater wire, the cathode being "connected to the heater supply circuit", and the cathode being "connected to ground", and the similar cathodes in Anderson 2,086,595 are connected to the antenna which is grounded.

In the McCullough patent, there is the C battery ("source of direct current"), which is substituted for the A battery. The grids are supplied by a conductor common to the cathodes, i. e., the conductor wire A which leads to all the grids and all the cathodes. This is what the A battery did in the "standard" set, before McCullough made any change in it. And this describes exactly the old "standard" set, which had "a source of direct current", i.e., an A battery in exactly the same place as McCullough connects his C battery.

Claim 3 concludes:
"means for tuning the circuits of said grids."

The McCullough patent shows the conventional tuned circuits of the old tuned radio frequency amplifier. They are referred to in the patent simply, and only,

as "two-stages of tuned radio frequency amplification". They are shown in Fig. 1 as an unmarked coil and unmarked variable condenser, in the input (grid) circuit of the first three tubes. There is no identification of the tuning coil and condenser by letter or number. And as the tuning in the old set remains exactly the same in the McCullough system, and is in only three of the five tubes, with no suggestion in the patent those three tubes operate differently from the others with respect to electrode connections, it is plain the "means for tuning" cannot make the claim patentable.

It is obvious from this patent McCullough thought he had made an invention in a new variety of "heater" tube, with top "heater" connections, shown in Fig. 2 of his patent, and for which he filed a patent application. He desired to sell this tube for use in "standard" sets on the market, with a minimum change in their conventional circuits. This could be done, because he had an outside "heater" circuit assembly. But so far as the ordinary operation of the "heater" type of tubes or grid bias (C supply) circuits, he made no invention.

Claim 3 is invalid, for want of patentable invention.

The Anderson patent 2,086,595 invalidates claim 3 (and 5). The Anderson patent 2,086,595 alone is a substantial anticipation of the McCullough claims. It has AC tubes, cathodes and heaters each supplied by a single source of energy and grounded, and a grounded grid, supplied by "a source of direct current". Anderson has only a single tuned radio frequency amplifier tube, but it would not require patentable invention to add one or more, connecting their electrodes to the same sources as are in the Anderson patent, and the "standard sets" referred to in the McCullough patent.

The Anderson patent 2,086,595 was filed on July 8, 1924, more than two years before the McCullough patent was filed on November 2, 1926, so Anderson is prior art against McCullough.

The Anderson patent in Fig. 1 shows the tuned radio frequency amplifier type

of receiver, with one stage of radio frequency amplification (tube 20), detector (30) and one audio amplifier tube (40), as stated in the patent.

Plaintiff says the Anderson cathodes are not grounded, but Mr. Carlson, defendant's witness, testified that they are. There is no evidence to the contrary.

Also, the McCullough claims 3 and 5 do not require that the cathodes be grounded. Only claim 3 mentions a ground, specifying that the "alternating current circuit" for heaters is "grounded". The same heating circuit in Anderson is "grounded".

Anderson uses a resistor, 25 energized by the rectified house supply, to supply voltage to the grids. Plaintiff says that Carlson contends a resistor "is not exactly equivalent to a battery". But the resistor is a "source of direct current", as is also a battery, and McCullough's claim 3 calls for a "source" and claim 5 for "a battery". What Carlson actually said was:

"Q. So that, in a sense, the resistors 24 and 25 are different from a battery? A. They serve the same purpose as a battery. That is resistor 25 has a potential across it as a battery would.

"Q. Then your answer is that it is the equivalent of a battery for fine [sic] grid potential? A. Yes, you could substitute potential for resistor 25."

And plaintiff's brief in questioning whether "the resistor of Anderson is a functional equivalent of a C battery", ignores the testimony of its witness, Mr. Batchelor, that in the RCA set, "the resistor then carrying the current constitutes a source of voltage corresponding to the C battery in the patents [McCullough] we are discussing."

Plaintiff's attack on the Anderson patent is that he shows only one tuned radio frequency amplifier tube instead of two, and only one audio frequency amplifier tube instead of two. But it would not require patentable invention to add another tuned radio frequency stage if more tuning and radio frequency amplification was desired, or another audio

frequency amplification stage if needed. The same A supply would be used for the cathode heaters, the same B supply for the anodes (plates) and the same C supply for the grids.

The Anderson patent invalidates claim 3, because the Anderson electrode supply circuits are the same, the difference being only in the numbers of electrodes connected to those circuits.

Claim 3 (and 5) is invalid, because "aggregative". Claim 3 is a combination of tube circuits and external tuned circuits, without any necessary relation. All five tubes have the same tube circuits. Only the first three tubes have tuning means (coil and variable condenser) in their input (grid circuits). The cathodes, heaters, grids and anodes in all five tubes operate independently of what may be outside the tube in the form of a tuned circuit. The claim is plainly aggregative; and therefore invalid.

### Conclusion

None of the claims in suit of the seven McCullough patents is valid.

The action should be dismissed.